# REVISED, AUGUST 26, 1997

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 96-60328

---

JAY HOUSTON MEADOWS

Petitioner

VERSUS

SECURITIES AND EXCHANGE COMMISSION

Respondent

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

August 22, 1997

Before DUHÉ, BENAVIDES, and STEWART, Circuit Judges.

DUHÉ, Circuit Judge:

Petitioner Jay Houston Meadows seeks review of an order of the Securities and Exchange Commission sustaining sanctions imposed on him by an administrative law judge for violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. We affirm.

I

At all relevant times, Jay Houston Meadows was a registered representative affiliated with Rauscher Pierce Refnes, Inc.

("RPR"), a registered broker-dealer.  In late 1990, Meadows, along with Marc W. Gunderson and William Craig Harriger,[1] formed Mundiger International, Inc. ("Mundiger") and Mira Golf International, Inc. ("Mira Golf") (collectively, the "Companies") to engage in two businesses:  Mira Golf was to wholesale recycled golf balls, and Mundiger was to use the sale proceeds of the recycled golf balls to drill and operate gas wells.[2]

The three principals, along with Brian Catlin, shouldered the management obligations for both Companies.  Gunderson, the brains behind the ventures, claimed to have much experience in both businesses and thus assumed the daily operating responsibilities; Harriger, an attorney, provided legal and administrative support; Catlin served as the Companies' CPA; and Meadows joined purportedly to assist Gunderson with managerial duties, to provide labor at Mira Golf, and to invest Mundiger's excess cash flow.  The Division of Enforcement ("Division")[3] contends, however, that Gunderson and Harriger recruited Meadows solely to raise capital, noting

---

[1]In May 1994, Gunderson and Harriger, without admitting or denying any of the allegations in the complaints against them, consented to the entry of permanent injunctions enjoining them from violating the antifraud provisions of the securities acts.

[2]Initially, Mundiger was to perform both businesses.  The principals created Mira Golf only after Meadows's RPR compliance officer informed Meadows that he could not serve as an officer or director in any venture that sought to raise capital through the sale of gas well interests.  RPR also prohibited Meadows from soliciting interests in either venture and from owning more than 10% of Mundiger's stock.

[3]All references to the Division are to the Securities and Exchange Commission's Division of Enforcement, the Respondent in this action.

Meadows's lack of relevant business experience other than his contacts to potential investors. Whether Meadows did in fact raise capital forms the basis of this appeal.

Pursuant to RPR's instructions, Meadows took no formal position at Mundiger, and he confined his investment in Mundiger to $10,000, for which he received 10% of its stock. Meadows also invested $100 in Mira Golf, for which he received an 8⅓% interest, and was appointed its secretary-treasurer and one of its directors.

Meadows and Harriger presented Mundiger to the "Masterminds," a small networking group established solely to discuss money-making opportunities,[4] and they arranged for Gunderson to speak at an upcoming meeting. At this meeting, Gunderson enthusiastically represented the Companies' prospects, promising that investors could expect high returns within months of their investment. Gunderson explained he had retained a lease on valuable gas-producing property in the Fort Worth Basin ("Property"), and that Mundiger had a contract to supply gas to the Texas Utility and Fuel Company ("TUFCO"), a local Texas utility, at a price above the current market price. He indicated he sought investors to help finance the drilling on the Property before the TUFCO contract expired in two-and-one-half years. Gunderson represented there was only a six-percent possibility--a figure he attributed largely to human error--that a particular well would fail to produce. Meadows challenged none of these assertions. Rather, he echoed Gunderson's enthusiasm, claiming Mundiger would hit gas wherever it drilled.

[4]Meadows and Harriger were members of the Masterminds.

Meadows, however, never seriously investigated the validity of such claims. He testified he relied largely on both Harriger's opinion of Gunderson and Gunderson himself. The only independent inquiry Meadows made was in late 1990 when he visited the Companies' offices after regular business hours--and in the absence of Gunderson and Harriger--to verify Mira Golf's golf ball inventory. When Harriger learned of the unannounced visit, he changed the locks and temporarily refused to give Meadows a key. Meadows, who was one of Mira Golf's officers and directors, was somehow untroubled by Harriger's action, testifying he knew he still had authority to inspect the books during business hours. Meadows, however, never chose at any time to examine any of the books because he "trusted that it was being taken care of."

Following the initial Masterminds meeting, Meadows, either alone or with Gunderson and/or Harriger, met in the RPR offices and elsewhere with Masterminds members and other potential investors to encourage their investment in the Companies. Between late 1990 and early 1991, Mundiger raised approximately $800,000 from over twenty investors through the sale of participation interests in several separate drilling programs. Mira Golf raised $78,000 from nine investors. Of the twenty or so investors in these Companies, ten were Meadows's RPR clients.[5]

Mundiger drilled its first two gas wells in early 1991. Output was far short of that represented by the principals; in

---

[5]The Division does not suggest that any of the investments passed through RPR or that Meadows received any commission from RPR for the investments made.

fact, production costs far exceeded revenues, a pattern that continued for six of the ten wells Mundiger drilled. Gunderson, however, falsely represented otherwise, claiming these wells were profitable. In a February 1991 memo to Meadows and Catlin, Gunderson and Harriger wrote that "we have grossly underestimated our wells['] production[,]" and urged Meadows and Catlin to solicit more investors for future programs. Without verifying Gunderson's claims of above-expectation well production, Meadows repeated them to potential investors. Investors testified that Meadows's positive characterizations of the wells' successes influenced their investment decisions.

In April 1991, Mundiger began paying investors their purported *pro rata* shares of revenues earned from gas production and sales to TUFCO. These distributions, however, were in excess of investors' actual shares but still significantly less than what Gunderson, Harriger, and Meadows had represented. Mundiger apparently obtained the funds for these overpayments from investor funds furnished for subsequent well programs.

In May 1991, Meadows resigned his positions at Mira Golf following various salary disputes with Gunderson and Harriger. Thereafter, he sold back some of his ownership interests in the Companies for an initial payment of $10,000 and additional monthly payments of $1,000 for one year. The monthly payments were conditioned, however, upon Meadows's silence as to the Companies' financial situation. Under this agreement, Meadows received $13,000 in total, approximately $3,000 more than his aggregate

5

investment just over seven months earlier.

In August 1991, Harriger told Catlin he suspected Gunderson of misappropriating Mundiger funds. In September 1991, Catlin assumed managerial responsibilities for Mundiger and discovered that in fact both Gunderson and Harriger had been misappropriating corporate funds for their personal uses. Catlin also learned that Gunderson had grossly misrepresented the Property's productive capacity; most of the wells had gone dry. Catlin further ascertained that the Companies had never been profitable; in fact, he determined that Mundiger was insolvent. Contrary to the promises of Gunderson, Harriger, and Meadows, none of the investors, except Meadows, recouped his or her initial investment.

In January 1994, the Securities and Exchange Commission ("Commission") instituted administrative proceedings against Meadows. It alleged that Meadows, in connection with the offer and sale of the Companies' securities, willfully violated § 17(a) of the Securities Act of 1933, § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. The ALJ agreed, finding Meadows had misrepresented to investors the risks of investing in the Companies, the likelihood the ventures would be profitable, and the speed with which investors would recoup their investments. The ALJ then barred Meadows from association with any broker-dealer with a right to reapply in two years; ordered Meadows to permanently cease and desist from committing or causing any violation of the antifraud provisions; and fined Meadows $100,000. On appeal, the Commission affirmed. Meadows appeals.

We uphold an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); accord Hawkins v. Agricultural Marketing Serv., 10 F.3d 1125, 1128 (5th Cir. 1993).  We uphold the Commission's factual findings if supported by substantial evidence. See 15 U.S.C. § 78y(a)(4); Whiteside & Co. v. SEC, 883 F.2d 7, 9 (5th Cir. 1989).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance." Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995) (footnotes omitted). It is not the function of an appellate court to reweigh the evidence or to substitute its judgment for that of the Commission. See id.

By contrast, legal conclusions are "for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency's] informed judgment.'" Faour v. United States Dept. of Agriculture, 985 F.2d 217, 219 (5th Cir. 1993) (quoting Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986)).

II

Section 17(a) of the Securities Act of 1933 states in pertinent part:

> It shall be unlawful for any person in the offer or sale of any securities . . ., directly or indirectly--
>
> > (1)  to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Meadows insists we cannot hold him culpable under this section.[6] We disagree.

A

Meadows reasons that § 17(a) culpability attaches only to "offerors" or "sellers" of securities, and he maintains he acted as neither in the offer and sale of the Companies' securities. The Division disputes Meadows's interpretation of § 17(a), arguing that § 17(a) encompasses more than just "offerors" or "sellers" because it applies to "any person *in* the offer or sale of any security" (emphasis added).[7] We need not resolve this interpretive issue.[8]

_____

[6]Meadows insists the Division conceded he did not act as a "seller" under § 17(a) when it informed the ALJ that it is not "alleging that Mr. Meadows quote unquote sold the securities." Meadows's allegation blatantly ignores the context in which this statement was made. In response to the ALJ's confusion as to exactly what charges Meadows faced and exactly in what capacity Meadows was charged, the Division explained, "We are not alleging § 5 [*i.e.*, 15 U.S.C. § 78e, which prohibits any broker or dealer from selling unregistered securities]. We are not alleging, although . . . it's implicit in much of the testimony . . . that Mr. Meadows quote unquote sold the securities. We are alleging nothing more than § 10(b) and § 17 may require . . . ."

[7]The Division does not specify, however, the class of defendants it believes is contemplated by § 17(a).

[8]Our research has uncovered no case squarely resolving this question. We recognize the Supreme Court has stated that the language of § 17(a) "does not require that the fraud occur in any particular phase of the selling transaction," <u>United States v.</u>

8

Even if we assume, without deciding, that § 17(a) applies only to offerors or seller, Meadows's argument still fails because substantial evidence demonstrates Meadows was, in fact, a "seller."

A "seller" is one who (1) "engages in solicitation," Pinter v. Dahl, 486 U.S. 622, 643 (1988), and (2) is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Pinter, 486 U.S. at 647.[9] Meadows fits squarely within this definition.

1

In the investment context, one who solicits attempts to produce the sale by urging or persuading another to act. See id. at 646. Persuasion can take many forms. Here, Meadows, who testified he considers himself a terrific salesman, admitted he could initiate a sale simply by informing a customer that he liked a certain investment or had invested in a particular venture. Substantial evidence shows Meadows exploited these sales tactics to raise capital for Mundiger and Mira Golf. By characterizing the Companies as opportunities too good to pass up, Meadows solicited many investors to furnish capital for worthless projects.

---

Naftalin, 441 U.S. 768, 773 (1979), and that "[t]he statutory terms [offer and sale] . . . are expansive enough to encompass the entire selling process, including the seller/agent transaction." Id. Naftalin, however, dealt with the single issue whether a seller could be held liable under § 17(a)(1) for fraudulent conduct directed against his broker.

[9]Although Pinter involved § 12 of the 1933 Act, it interpreted language identical to that found in § 17(a), viz., the terms "offer" and "sale." The ALJ's decision to apply the Pinter definitions to the instant case was therefore proper and is not questioned by the parties.

9

In particular, the record demonstrates Meadows recommended the Companies to investors;[10] claimed that Mundiger would hit gas wherever it drilled; avowed that an investment in Mundiger was a "sweetheart" or "slam dunk" deal; estimated that Mira Golf's potential profit on each recycled golf ball was between $.19 and $.50; assured that an investment in Mira Golf was "pretty safe"; maintained that investors could expect payback within six-months; conveyed that the first two wells "came in real well" but that the latest well package was "the most sure thing" and a "huge plum"; asserted that investments in Mundiger and Mira Golf would help realize the investor's investment goals; advised investors on means by which they could procure funds to invest in the Companies; remarked that demand to participate in the well programs was greater than the supply of participation interests; commented that all his RPR clients invested in the Companies; and disclosed that he had done the same.[11]

Notably, the record also reveals that others perceived Meadows as a fundraiser. Investors testified they considered Meadows the

---

[10]Four investors testified that Meadows recommended investments in one or both of the Companies; three of the four were Meadows's RPR clients. At least two investors testified they would not have become involved with the Companies absent Meadows's recommendation.

[11]Meadows points to four witnesses who testified that he did not solicit their investment. Nonetheless, two of these investors later testified they relied on Meadows's investment suggestions; one later testified he wouldn't have gotten involved had Meadows not recommended the investment; and another testified he tendered payment to Meadows. In any event, that some witnesses did not testify against Meadows does not refute others' statements that Meadows had solicited *them*.

"salesperson" of the Companies' three principals.[12]  Gunderson and Harriger viewed Meadows similarly.  When Mundiger was short on capital, they wrote to Meadows and Catlin asking them to "contact [their] investors" and to "get [their] feelers out now."  Meadows himself understood his role to be that of a salesman.  After another client made the decision to invest, Meadows declared, "Boy, I wish all my sales were that easy."  The evidence establishes, therefore, that Meadows engaged in the solicitation of investments.[13]

2

Liability will extend to Meadows, however, only if substantial evidence shows that his solicitations were motivated by personal financial gain.  See Pinter, 486 U.S. at 647.  "Congress did not intend to impose [liability] on a person who urges the purchase but whose motivation is solely to benefit the buyer."  Id.  Meadows claims his motivations were pure, arguing that the evidence shows only that he was motivated by a gratuitous desire to share an attractive investment opportunity with his fellow country club members and others.  In support, he notes he received neither a salary from the Companies nor a commission from RPR.  These facts,

_____

[12]The testimony shows that Meadows used his RPR offices to solicit or to participate in the solicitation of investors; that he personally picked up an investment check at an investor's home; and that he accepted investment checks from investors at his RPR offices.  Such utilization of his RPR offices lends further support to investors' perceptions of Meadows as a salesman.

[13]We emphasize that we considered the totality of the circumstances in finding that Meadows solicited investors.  No particular factor played a determinative role in our decision.

11

however, are not dispositive.  Where a defendant "anticipat[es] a share of the profits," the Supreme Court has held that he has solicited for personal financial benefit.  See id. at 654 (alteration in original).  Meadows was a shareholder of both Mundiger and Mira Golf and thereby stood to benefit personally from the additional investments he solicited.[14]  We conclude, therefore, that substantial evidence supports the Commission's finding that Meadows acted as a seller under § 17(a).

B

Meadows also complains he cannot be held culpable under § 17(a) insofar as substantial evidence fails to show he acted with scienter.[15]  Liability under § 17(a)(1) attaches only upon a showing of severe recklessness.  See Securities and Exchange Comm'n v. Southwest Coal and Energy Comm'n, 624 F.2d 1312, 1320-21 & n.17 (5th Cir. 1980).  Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

See Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir.

---

[14]Though Meadows did not invest directly in any of Mundiger's well programs, Mundiger itself held a 22½ % to 63% working interest in each drilling program.

[15]Meadows was charged with violating all three subsections of § 17(a).  Scienter is not an element of a § 17(a)(2) or § 17(a)(3) cause of action, however.  See Aaron v. Securities & Exchange Comm'n, 446 U.S. 680, 697 (1980).  Under these subsections, culpability is established merely by a showing of negligence.  See id.

1981) (en banc); <u>Southwest Coal</u>, 624 F.2d at 1321 n.17.  Although Meadows insists the record does not show that he knew or should have known his conduct presented a danger of misleading others, the substantial weight of the evidence demonstrates otherwise.

Meadows solicited investors with materially false and misleading claims that Mundiger and Mira Golf were low-risk investments that were virtually certain to yield a high return.[16] Moreover, Meadows failed to disclose many material facts, including that:  he, an officer and director of Mira Golf, had been temporarily denied after-hours access to the Companies' books; he had never conducted a background investigation into Gunderson, any of Gunderson's assertions, or the Companies' purported successes and that therefore, he had no basis for recommending the investments; he was aware Gunderson recently had been accused of misappropriation; he was aware Gunderson, while unemployed, was known as a big spender; he was aware Gunderson had a reputation for being able to "sell ice to an Eskimo"; he was aware Gunderson and Harriger refused to follow Catlin's recommendation that they maintain separate bank accounts for each of Mundiger's drilling programs; he discovered the funds for each drilling project were commingled; and he had been forced out of the Companies by Gunderson and Harriger, who also paid him to be silent about the Companies' financial situation.

In light of his knowledge of these disturbing facts, to say

---

[16]<u>See</u> *supra* Part II.A.1.

that Meadows, a securities professional,[17] knew or should have known that his recitations of Gunderson's consistently optimistic claims of the Companies' successes presented a danger of misleading buyers is an understatement.[18]  We conclude, therefore, that substantial evidence supports the Commission's determinations.

III

The Commission also found that Meadows willfully violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Meadows disputes only whether substantial evidence supports the Commission's finding that he acted with scienter.  As with § 17(a), liability under § 10(b) and Rule 10b-5 attaches upon a showing of severe recklessness.  See Broad, 642 F.2d at 961-62.  As discussed above, we have concluded that Meadows acted with the requisite scienter.  We thus affirm the Commission's findings.

---

[17]Meadows attacks certain language in the Commission's opinion as erroneously imposing upon him those due diligence obligations pertinent only to a securities professional acting in that capacity.  Because the Division does not allege Meadows acted as a registered representative with respect to the sale of interests in the Companies, Meadows argues we must reverse.

At one point in its opinion, the Commission referred to a stockbroker's obligation to investigate any highly optimistic claims he or she makes.  This reference notwithstanding, we conclude the Commission's finding of scienter turned on its determination that Meadows, whether acting as a registered representative or otherwise, exhibited conduct that represents an extreme departure from the standards of ordinary care.  Meadows made material misrepresentations and omitted material facts when he had strong reasons to do otherwise, and his actions or lack thereof presented a clear danger of misleading buyers.  We therefore find Meadows's argument without merit.

[18]The Commission rejected Meadows's explanations for his conduct.  Substantial evidence supports this decision.

14

IV

Meadows next alleges the ALJ denied him a fair hearing.

A

Meadows claims first that the ALJ failed to give any reasons both for his decision to reject testimony indicating Meadows did not solicit investors and for his conclusion that Harriger, a less-than-trustworthy individual, was a credible witness for the Division. We are bound by an ALJ's credibility determinations. See Helena Laboratories Corp. v. NLRB, 557 F.2d 1183, 1187 (5th Cir. 1977). "If, however, the credibility choice is based on an inadequate reason, or no reason at all, we are not compelled to respect it, and shall not do so." NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 843 (5th Cir. 1978).

We disagree with Meadows's contention that the ALJ failed to give any reasons for his decision. The ALJ stated he reviewed the testimony and found it does not support Meadows's claim of an unfair hearing. Our review of the record satisfies us that the ALJ's reason is adequate. As to Harriger's credibility, we point out that the Commission noted its findings of Meadows's culpability do not rest on Harriger's testimony. On appellate review, our job is not to reweigh the evidence. Our job is to review the record to determine if substantial evidence supports the judge's finding. It does.[19]

B

_____

[19]We note that Meadows has failed to point to anything in the record suggesting the ALJ's credibility assessments should not be upheld.

15

Meadows next argues that the ALJ evidenced a pattern of bias or prejudice against him. He claims the ALJ aggressively supported the Division's case by vigorously cross-examining Meadows's witnesses, by restricting the evidence exculpating Meadows of fraudulent conduct, and by targeting Meadows and his counsel with sarcastic comments.

In Liteky v. United States, 114 S. Ct. 1147 (1994), the Supreme Court set forth the standard for establishing bias. The Court said, "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. at 1157. The Commission considered Meadows's allegation of procedural impropriety and concluded the ALJ treated both sides equally. Substantial evidence supports this finding: the ALJ cross-examined witnesses on both sides, limited the number of witnesses each party could call, finding the testimony repetitive, and plied both parties with sarcasm.

V

Meadows next argues that the sanctions imposed on him by the Commission--a bar from association with any broker or dealer with the right to reapply in two years, a cease and desist order, and a $100,000 fine--are unwarranted. We will affirm the Commission's imposition of sanctions absent arbitrariness or an abuse of discretion. See Whiteside, 883 F.2d at 10. Moreover, "[i]t would

16

be a gross abuse of discretion to bar an investment advisor from the industry on the basis of isolated negligent violations." Steadman v. Securities & Exchange Comm'n, 603 F.2d 1126, 1141 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981).

Meadows gives us no reason to disturb the Commission's choice of sanctions. The temporary bar from association is neither arbitrary nor an abuse of discretion. The record demonstrates Meadows engaged in a continual pattern of culpable behavior with severe recklessness and with almost no thought to those he would harm.[20] The temporary bar from association is thus an appropriate remedy designed to protect the public from future misconduct.[21]

Moreover, the $100,000 fine is justified. Section 21B(b) of the Exchange Act, 15 U.S.C. § 78u-2(b), grants the Commission authority to assess penalties of $100,000 for each fraudulent act or omission if it resulted in substantial losses. Every investor, except Meadows, suffered losses. By the close of 1993, Mundiger investors had received a return of $167,445 on aggregate

---

[20]Meadows relies on Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996), for the proposition that a temporary bar from the securities industry is a punitive rather than remedial sanction. Meadows's reliance on Johnson is misplaced, however. Johnson emphasized that the imposition of a six-month suspension is less penal in nature where the reason for the sanction is the degree of risk petitioner poses to the public and is based upon findings demonstrating petitioner's unfitness to serve the investing public. See id. at 489. In the instant action, the ALJ made such findings.

[21]Meadows argues the temporary bar from the brokerage industry sounds the death knell for his career as a stockbroker. We note, however, that re-entry following a temporary bar is neither illusory nor unwelcome. See In re Arthur H. Ross, Exchange Act Release No. 34-30956, 1992 WL 188932, at *2-3 (SEC July 27, 1992); In re Paul Edward Van Dusen, Exchange Act Release No. 34-18284, 1981 WL 27886, at *3 (SEC Nov. 24, 1981).

investments of $783,126; Mira Golf investors lost more than 90% of their investment. The imposed sanctions are thus not disproportionate to Meadows's conduct.

VI

For the foregoing reasons, we AFFIRM.