**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 96-60754**

---

**MATTHEW HALL,**

Petitioner,

**VERSUS**

**CONSOLIDATED EMPLOYMENT SYSTEMS, INC.;**
**WAUSAU INSURANCE COMPANIES; DIRECTOR,**
**OFFICE OF WORKER'S COMPENSATION PROGRAMS,**
**U.S. DEPARTMENT OF LABOR,**

Respondents.

---

On Petition for Review of an Order of the
Benefits Review Board
United States Department of Labor

---

April 24, 1998

Before GARWOOD, DUHÉ, and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:

Appellant, Matthew Hall ("Hall"), appeals the order of the Benefits Review Board ("Board") affirming the Administrative Law Judge's ("ALJ") award of compensation under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq. We affirm, finding that the Board's order is supported by substantial evidence and is in accordance with the law.

I. FACTS

In early 1991, Hall began working for Consolidated Employment Systems, Inc. ("CESI") as a painter and sandblaster. CESI, now defunct, was a temporary employment agency that provided its clients with sandblasters, painters, and other unskilled laborers. Hall's first and only job assignment began at Equitable Shipyard in New Orleans, Louisiana. Trinity Marine, a client of CESI, owned the shipyard and utilized it for cleaning and repairing barges and other vessels.

On March 13, 1991, in his second month on the job, Hall fell from a scaffold that a coworker had inadvertently bumped. He landed on the ground ten to fifteen feet below, sustaining injuries to his right knee, leg, and hip. Hall was twenty-seven years old at the time.

After the fall, Hall was promptly taken to a local hospital where he was treated and discharged. The next day, Hall reported to a medical clinic for additional treatment where he was examined by Dr. Robert Segura ("Dr. Segura"). Over the course of the next three weeks, Hall was examined at the clinic on five separate occasions by several different physicians. Dr. Segura ultimately concluded that Hall had suffered a "soft tissue injury" resembling a sprain, which had resulted in no permanent disability. Hall was released for regular work duty on March 26, 1991.

Hall subsequently complained that continued discomfort from his injuries prevented him from returning to work. Dr. Segura then referred Hall to Dr. George Murphy ("Dr. Murphy"), an orthopedist, who treated Hall on a routine basis from April 9, 1991 through July 21, 1992. Over the next fifteen months, Hall repeatedly complained of pain emanating from his knee, hip, and back.[1] Dr. Murphy examined Hall on nineteen separate occasions and performed a battery of tests. He found that Hall had suffered a sprained knee and a possible bone contusion, which had both since healed. Dr. Murphy also diagnosed Hall with a possible tear of his meniscus, although he concluded that the tear, if any, was too slight to destabilize the knee. Although Dr. Murphy detected an asymmetrical disc in Hall's spine, he concluded that the condition was not degenerative and did not limit Hall's activities. Dr. Murphy released Hall for regular work duty on January 2, 1992. The doctor also determined that Hall had reached maximum medical improvement as of that date.

On the advice of his attorney, Hall sought the expertise of another doctor, Dr. Harry Hoerner ("Dr. Hoerner"), who was an orthopedist. Dr. Hoerner examined Hall on three occasions between September 24, 1992 and May 20, 1993. Dr. Hoerner concluded that Hall had suffered a "very tiny tear" in his meniscus that did not require treatment. Dr. Hoerner also found two abnormal disks in Hall's back. The back condition prompted the doctor to restrict Hall from engaging in heavy work, although he did not restrict Hall from other types of work. Dr. Hoerner concluded that Hall had reached maximum medical improvement on September 24, 1992, the date Dr. Hoerner first examined Hall.

From March 14, 1991 through January 29, 1992, CESI voluntarily paid Hall disability compensation. When the payments ceased, Hall filed a claim with the United States Department of Labor under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). A formal hearing was held before an administrative law judge on December 6, 1993. On January 27, 1995, the ALJ issued a decision and order awarding Hall temporary disability benefits based on an average weekly wage of $41.09. As the ALJ found that Hall had reached maximum medical improvement on January 2, 1992, the ALJ ordered that Hall receive compensation for the period of time between March 13, 1991, the date of his injury, and January 2. The ALJ also ordered CESI to reimburse Hall for his medical expenses, excluding those associated with Dr. Hoerner.

Hall appealed the ALJ's decision to the Benefits Review Board. On September 12, 1996, in accordance with

---

[1] The ALJ found that Hall complained of back pain for the first time while being treated by Dr. Murphy.

the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 ("Appropriations Act" or "Act"), the Board automatically affirmed the ALJ's decision, without argument, as Hall's petition had been pending before the Board for more than one year.[2]  Hall appeals to this Court pursuant to § 921(c) of the LHWCA.  33 U.S.C. § 921(c).  The Director, Office of Workers' Compensation Programs, United States Department of Labor ("Director"), joins in the appeal.

## II.  DISCUSSION

This Court must affirm the ALJ's decision if it is in accordance with the law, is rational, and is supported by substantial evidence.  *See Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 944 (5th Cir. 1991).  Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quotations omitted).  The requirement of substantial evidence "is less demanding than that of preponderance of the evidence, and the ALJ's decision need not constitute the sole inference that can be drawn from the facts." *New Thoughts Finishing Co. v. Chilton*, 118 F.3d 1028, 1030 (5th Cir. 1997).

### A.

Hall contends that the provisions of the Appropriations Act that automatically affirmed the ALJ's decision violate his right to due process.  He maintains that he acquired a vested right to Board review the moment he filed his workers' compensation claim, and that the retroactive application of the Act to his petition wrongfully deprived him of that right.  Hall, who points to no specific authority for this proposition, attempts to draw support from the general principle that "retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  He further argues that while "Congress has the power to place the Board's limited function anywhere it chooses," *Kalaris v. Donovan*, 697 F.2d 376, 388 (D.C. Cir.), *cert. denied*, 462 U.S. 1119 (1983), it lacks the authority to remove one full level of review.  Hall's argument is foreclosed by circuit precedent.

In *Shell Offshore, Inc. v. Director, OWCP*, 122 F.3d 312, 315 (5th Cir. 1997), we affirmed the constitutionality of the Appropriations Act as it bears on a petitioner's right to due process under the Fifth Amendment.  In that case, we explained that "the essential element of due process is the right to notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Shell Offshore*, 122 F.3d at 315 (quoting *Eldridge*, 424 U.S. 319, 333 (1976)) (internal quotation marks omitted).  Due process was not violated in *Shell Offshore*, and is not in jeopardy

---

[2]     The Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, provides that the United States Department of Labor is prohibited from using appropriated funds after September 12, 1996, to review cases that have been pending for the Benefits Review Board more than a year as of that date.  Those pending for such time and not acted upon are required to be considered affirmed and final on September 12, 1996, for purposes of judicial review.

here, because a claimant who loses board review under the Act is nonetheless afforded "not only . . . a full pre-deprivation, trial-type hearing before the ALJ, [but] also . . . a post-deprivation hearing in the Circuit Courts of Appeals." *Id.* Accordingly, we reject Hall's due process challenge.

B.

Hall next argues that the ALJ erred by calculating his disability award based on an average weekly wage of $41.09. According to Hall, the error resulted from the ALJ's decision to calculate his award under § 910(c) of the LHWCA, instead of § 910(b). The Director likewise contends that the ALJ erred in determining Hall's average weekly wage.

Under the LHWCA, disability compensation is based on the injured worker's average weekly wage. 33 U.S.C. § 910. Section 910 of the Act provides three different methods for calculating an average weekly wage: Sections 910(a), (b), and (c).[3] *Id.*; *see SGS Control Servs. v. Director, OWCP*, 86 F.3d 438, 441 (5th Cir. 1996).

Section 910(a) applies in cases where the injured claimant "worked in the employment in which he was

---

[3] Section 910 provides in pertinent part:

> Except as otherwise provided in this Act, the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:
>
> (a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.
>
> (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.
>
> (c) If either of the foregoing methods of arriving at the average annual earnings of the injured employee can not reasonably and fairly be applied, such average annual earnings shall
> be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in
> self-employment, shall reasonably represent the annual earning capacity of the injured employee.

33 U.S.C. § 910(a)-(c).

working at the time of the injury . . . during substantially the whole of the year immediately preceding his injury." *Id.* § 910(a). Section 910(a) computes an average weekly wage based on the claimant's actual employment history. *Id.* The parties correctly agree that § 910(a) is not applicable to our facts.

Section 910(b) provides that if the employee has not worked substantially all of the preceding year in the employment in which he was working at the time of injury, his average weekly wage is based on the employment history of a typical worker in similar employment and in the same locality. *Id.* § 910(b). Section 910(b) is generally used when the injured worker has had too little time on the job to allow an accurate determination of his wages.

Section 910(c) governs when the first two methods cannot "reasonably and fairly be applied." *Id.* § 910(c); *Empire United Stevedores v. Gatlin*, 936 F.2d 819, 822 (5th Cir. 1991). This typically occurs when the claimant's work is "inherently discontinuous or intermittent, . . . and when 'otherwise harsh results' would follow were an employee's wages invariably calculated simply by looking at the previous year's earnings." *Empire United Stevedores*, 936 F.2d at 822. In contrast to §§ 910(a) and (b), § 910(c) does not impose a time limitation on the weekly wage determination. *See* 33 U.S.C. § 910(c); *Empire United Stevedores*, 936 F.2d at 822. Thus, the time period used to assess the claimant's weekly wage "is not limited to the 52 weeks immediately preceding the injury, but includes all of the employee's relevant work experience." *Empire United Stevedores*, 936 F.2d at 823.

In challenging the ALJ's application of § 910(c), Hall and the Director allege that § 910(b) is the governing provision because Hall's employment was not intermittent or discontinuous. Hall and the Director point to evidence that Hall's foreman at the shipyard, Haroun Kahn ("Kahn"), told Hall that he would be hired on a permanent basis by Trinity Marine. We are not persuaded.

It is true that at the administrative hearing Kahn admitted to promising Hall permanent employment. But there is some question as to whether that promise would have in fact come to fruition. Evidence was presented that Kahn did not have the authority to hire Hall. The record reflects that Hall would not have been hired until he had been evaluated for a longer period of time. Kahn's promise, standing alone, falls far short from establishing that Hall's employment with CESI would have lead to permanent employment with Trinity Marine.

Another flaw in Hall's argument is that the evidentiary significance of Kahn's promise is substantially outweighed by other evidence that Hall's employment was inherently unpredictable. The parties do not dispute that CESI was an employment agency which, by nature, provided temporary labor to its employees. The record reflects that CESI's employees were employed on a contract-by-contract basis. Once a particular job ended, their employment with CESI ceased. There is evidence that the turnover rate at CESI was extreme; over the course of just one year, CESI was required to issue between 5,000 and 6,000 W-2 tax forms even though its weekly work force consisted of only 350 to 400 employees.

Of course, this evidence speaks only to employment with CESI generally, and not to Hall's particular

circumstances of employment. As such, we reviewed the record for evidence regarding Hall's employment as a sandblaster. We found no evidence regarding how long sandblasters usually worked at the shipyard on one job, or what percentage of sandblasters were eventually retained by Trinity Marine. The only evidence on this point showed there was no typical time frame for sandblasting jobs; some lasted weeks, some lasted months. Similarly, there was no evidence regarding how long Hall's particular job at the shipyard was scheduled to last.

In short, while there is some evidence that Hall's position would have potentially lead to permanent employment, there is countervailing evidence of a greater quantum that his employment was intermittent and discontinuous. Hence, we cannot say that the ALJ's finding is not supported by sufficient evidence. "The ALJ is entitled to deference and his selection of reasonable conflicting factual inferences is conclusive on the Board if supported by the evidence and not inconsistent with the law." *New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031, 1037 (5th Cir. Unit A Nov. 1981).

A final reason for rejecting Hall's argument is that Hall failed to present the ALJ with any evidence regarding the wages of other similarly situated sandblasters. That failure is fatal to Hall's claim because § 910(b) expressly requires evidence regarding the earnings "of an employee of the same class working in similar employment in the same or a neighboring place." 33 U.S.C. § 910(b). Accordingly, without evidence of what other sandblasters were earning at the time of Hall's injury, the ALJ could not reasonably use § 910(b) to calculate Hall's average weekly wage.

Hall and the Director also argue that even if § 910(c) is the appropriate provision, the ALJ erred by basing Hall's average weekly wage solely on Hall's earnings during the eight years prior to his employment with CESI. They allege that the ALJ was required to calculate his average weekly wage in accordance with his earnings at the time he was injured, roughly $305 a week. Although this claim carries some force, it does not carry the day.

We have held that when an ALJ determines a claimant's average weekly wage by considering his earning history over a period of years, the ALJ "must take into account the earnings of all the years within that period." *Empire United Stevedores*, 936 F.2d at 822. Thus, the judge must consider the claimant's actual wages at the time he was injured. *Id.* However, "the amount actually earned by the employee at the time of the injury is a factor, but not the overriding concern under Section [9]10(c)." *Id.* As such, it stands to reason that an ALJ, when evaluating a claimant's earning capacity at the time of injury, may exclude current earnings from his calculations if those earnings are not helpful in gauging the claimant's true earning capacity.

In this case, the ALJ determined that Hall's wages at the time of injury did not adequately reflect his earning capacity. The ALJ based his conclusion on the temporary and unpredictable nature of Hall's employment. The judge then averaged Hall's yearly income from 1983 to 1990, to the exclusion of his earnings with CESI in 1991. Having reviewed the facts of this case in light of the applicable law, we cannot conclude that the ALJ's decision to exclude Hall's earnings in 1991 is erroneous. We must note, however, that our affirmance of the ALJ on this point is based

more our standard of review, than on our belief that the ALJ acted wisely by excluding those earnings.

The essential purpose of the average weekly wage determination is to reflect "a claimant's annual earning capacity *at the time of the injury*." *Empire United Stevedores v. Gatlin*, 936 F.2d 819, 823 (5th Cir. 1991) (emphasis added). Typically, a claimant's wages at the time of injury will best reflect the claimant's earning capacity at that time. It will be an exceedingly rare case where the claimant's earnings at the time of injury are wholly disregarded as irrelevant, unhelpful, or unreliable.

In this case, the ALJ's decision to exclude Hall's earnings comes dangerously close to reversible error. However, we do not reverse the ALJ because we are required to review the ALJ's decision under the substantial evidence standard. Under that standard, "we may not substitute our judgment for that of the ALJ, nor may we reweigh or reappraise the evidence." *Louis Dreyfus Corp. v. Director, OWCP*, 125 F.3d 884, 886 (5th Cir. 1997). Our focus is strictly confined to whether there exists evidence that "a reasonable mind might accept as adequate to support a conclusion." *Pierce*, 487 U.S. at 565.

Having performed that precise inquiry, we find there is sufficient evidence to support the ALJ's determination that Hall's employment with CESI was unpredictable, and that the exclusion of those earnings was required. Admittedly, had we stood in the shoes of the ALJ, we very well may have done things differently. But such musings cannot form the basis of our decision. We affirm the ALJ's exclusion of Hall's 1991 earnings from the weekly wage determination because there is substantial evidence supporting that decision.

C.

Hall's remaining claims challenge various findings by the ALJ. He contends that the ALJ erred in finding: (1) that Hall was not entitled to the medical expenses he incurred while under the supervision of Dr. Hoerner; (2) that Hall reached maximum medical improvement on January 2, 1992; and (3) that Hall had not sustained a permanent disability. We disagree.

The ALJ's findings are supported by substantial evidence. Indeed, given the nature and extent of Hall's injury, we are somewhat amazed by the quantity of evidence that was produced in this case. Hall, who ostensibly suffered a minor knee injury, commanded more than two dozen examinations, countless studies and tests, and an extraordinary number of medical man-hours. Nearly all of the evidence generated from the examinations, tests, and studies pointed to one conclusion: Hall had not suffered a disabling injury that prevented him from returning to work.

Additionally, we must note that the ALJ's findings were influenced, in large part, by serious questions regarding Hall's credibility. In his written order, the ALJ observed that "[Hall] testified at length during the trial. Due to his demeanor in Court, the inconsistencies in some of his statements, his evasiveness during questions by the Court and his exceptionally sporadic employment history, the Court doubts that he desires to return to any type of work."

Clearly, Hall's testimony's left the ALJ firmly convinced that Hall was a chronic malingerer. As we find no reason to doubt that credibility determination, we are bound by it. *Meadows v. Securities & Exchange Comm'n*, 119 F.3d 1219, 1227 (5th Cir. 1997).

III.

Because the ALJ's findings are supported by substantial evidence, and because there is no clear error of law, the Board's order affirming the ALJ's decision is **AFFIRMED**.

Garwood, Circuit Judge, concurring in part and dissenting in part:

I concur in all the able majority opinion (including but not limited to its holding that the ALJ was not obligated to apply section 910(b)) except only the holding that the ALJ did not reversibly err by basing his computation of Hall's earning capacity solely on his average yearly income from 1983 to 1990 without including any of his earnings during the some ten weeks in 1991 when he worked as a painter and sandblaster for CESI prior to his injury. While the 1991 earnings may indeed have been atypical, that, it seems to me, is taken care of by averaging back to 1983. Moreover, the 1991 earnings not only represented Hall's longest continuous employment during the period since 1983, but were also the most closely related to the injury in time and type of employment. In my view, the ALJ's decision in this one respect is properly characterized as being an abuse of discretion, unsupported by substantial evidence, and arbitrary and capricious.

8