# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-60056
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2016

Lyle W. Cayce
Clerk

KEILEN DIMONE WILEY,

     Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION,

     Respondent

Petition for Review of an Order of the
Securities and Exchange Commission

Before HIGGINBOTHAM, PRADO, and HAYNES, Circuit Judges.

PER CURIAM:*

     Keilen Dimone Wiley petitions this court for review of an opinion and order of the Securities and Exchange Commission ("SEC") sustaining the Financial Industry Regulatory Authority's ("FINRA") findings that Wiley's conduct violated various FINRA Rules. For the reasons discussed below, Wiley's petition is DENIED.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-60056

## I. Background

From 2002 to 2011, Petitioner Keilen Dimone Wiley was associated with Farmers Financial, LLC, a FINRA[1] member firm.  During that time, Wiley held two different securities licenses: an Investment Company Products/Variable Contract Limited Representative license (Series 6) and a Uniform Securities Agent license (Series 63).  Wiley also worked as an independent insurance agent with Farmers Insurance, an affiliate of Farmers Financial, LLC.

The relationship between Farmers and Wiley was memorialized in an Agent Appointment Agreement on July 1, 2002.  The Agent Agreement states that Wiley will "sell insurance for [Farmers] and . . . submit to [Farmers] every request or application for insurance . . . in accordance with their published Rules and Manuals," and "provide the facilities necessary to furnish insurance services . . . including . . . collecting and promptly remitting monies due to [Farmers]."  The Agreement also clarifies that Wiley "is an independent contractor" who "shall, . . . exercise sole right to determine the time, place, and manner in which the objectives of this Agreement are carried out, provided

---

[1] FINRA is a self-regulatory organization ("SRO") registered with the SEC under 15 U.S.C. § 78s.  Although FINRA is not a government entity, it is responsible for the self-regulation of member brokerage firms, exchange markets, and individuals associated with those firms and markets.  FINRA is empowered to discipline members for violations of their rules by suspension, expulsion, or by barring an individual from associating with a FINRA member.  15 U.S.C. § 78o-3(b)(7); *see also Fiero v. FINRA*, 660 F.3d 569, 574 (2d Cir. 2011). The SEC is charged with the oversight and supervision of SROs, including FINRA, and must approve all rules of an SRO before their implementation.  Relevant to Wiley's case, appeals from decisions by FINRA are taken by the National Adjudicatory Counsel, which can then be appealed to the SEC.  15 U.S.C. § 78s(d)(2).  The SEC performs an independent review of the record and applies a preponderance of the evidence standard when reviewing SRO disciplinary actions.  *In re Levine*, SEC Release No. 48760, 2003 WL 22570694, at *2, *9 n.42 (Nov. 7, 2003).

No. 16-60056

only that [Wiley] conform to normal good business practice, and to all State and Federal laws governing the conduct of [Farmers] and their Agents."

All insurance agents affiliated with Farmers were required to use an Agent's Credit Advice ("ACA") system to process customer insurance payments. By using the ACA system, agents could open an ACA entry for the day, input multiple policyholders' payment information, and close the ACA entry later that day such that the policyholder would be credited for the premium payments on their policy. As for the corresponding customer premium payments, Farmers established "co-banking" accounts for their agents to deposit collected customer insurance premium payments. Wiley's Farmers co-banking account was held at Bank of America.

Farmers published two manuals relevant to the proceedings against Wiley: the Farmers Insurance Group of Companies Agency Operations-Agent's Guide ("Agent's Guide") and the E-Agent ACA Co/Banking User Guide & Fastpath Manual ("ACA Manual"). Both the Agent's Guide and the ACA Manual stressed the importance of agents making timely deposits in their co-banking accounts. In a section titled "ACA Receipts do not Balance to the Deposit," the Agent's Guide states that, if there is a delay in depositing money to the co-banking account, the agent should "deposit all cash collections, which balance to the ACA, within one business day after the ACA is closed." The ACA Manual states that "Use of the ACA Co/Banking program necessitates that the money to cover each ACA be available in the Co/Banking Account on the business day after the ACA is transmitted. The good business practice of depositing collections daily is now essential." The ACA Manual further states that "[n]o matter what kind of schedule is set up in your office, any agent submitting an ACA must deposit all checks and cash reported under his or her ACA within one business day after the ACA is closed."

3

No. 16-60056

In his capacity as an independent insurance agent, Wiley did business in the state of Texas as Wiley Insurance Agency & Associates ("WIA"). In addition to his Farmers co-banking account, Wiley maintained two WIA bank accounts at JPMorgan Chase Bank, N.A.: a business banking account for business and personal expenses, and a merchant banking account used for insurance premium payments submitted by customers who wanted to use a credit card.

From March 2011 to April 2011, Wiley collected $7,703.06 in insurance premium payments from fifty-four customers. Wiley recorded the payments in the ACA system, but failed to deposit $6,532.70 of the premiums he collected into the co-banking account. A Farmers internal audit team discovered the discrepancy between Wiley's ACA and co-banking account and commenced an internal investigation led by Daniel Edmonds, Senior Audit Consultant at Farmers. A review of Wiley's bank accounts, including his co-banking account, WIA accounts, and personal accounts, demonstrated that, from April 6, 2011, to May 1, 2011, Wiley did not have enough funds to cover the premiums reported in the ACA. Wiley was interviewed as part of the audit process, and admitted that he used customer premium payments to pay for his business and personal expenses in a written statement which he reviewed and signed after the interview. The next day, Wiley sent an additional statement to Farmers via email in which he admitted that he was "using customer payment and repaying Farmers later" and knew that he "would be walking a fine line," but that "[i]t was a risk I was willing to take . . . [b]ecause I had to keep the business going." Farmers terminated its relationship with Wiley on July 7, 2011.

Following Wiley's termination from Farmers, FINRA's Division of Enforcement began an investigation into Wiley's conduct. Wiley was required, under FINRA Rule 8210, to provide sworn, on the record testimony concerning his behavior, and was asked whether customer premium payments were used

4

No. 16-60056

to pay for personal or business expenses. Wiley responded "No," and then proceeded to explain that he always had the money from the customer payments in his various accounts.

## II. Procedural History

On February 13, 2013, FINRA's Division of Enforcement filed a complaint alleging that Wiley had both intentionally converted[2] customer insurance premium payments for his own use in violation of FINRA Rule 2010[3] and provided false and misleading testimony when he denied using the premiums for personal use in violation of FINRA Rules 2010 and 8210.[4] After a hearing, a majority of the three-member FINRA hearing panel found Wiley's actions and testimony violated FINRA Rules 2010 and 8210. Based on the finding that Wiley had converted customer funds, the panel barred Wiley from associating with a FINRA member firm. The panel declined to impose additional sanctions for Wiley's false testimony. One of the three panelists on the FINRA hearing panel dissented, finding that the premiums belonged to WIA and WIA owed a debt to Farmers, and that the written statement admitting Wiley's personal use of the premiums was signed under duress.

Wiley appealed the decision of the FINRA panel to the National Adjudicatory Council ("NAC"), who affirmed the FINRA panel's findings of violations and corresponding sanction. Wiley then appealed to the SEC, which

---

[2] Conversion is defined in the FINRA Sanction Guidelines as "an intentional and unauthorized taking of and/or exercise of ownership over property by one who neither owns the property nor is entitled to possess it." FINRA Sanction Guidelines 36, n.2.

[3] FINRA Rule 2010 states that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." FINRA Manual Rule 2010.

[4] FINRA Rule 8210(a)(1) states that FINRA has the right "to require a . . . person associated with a member . . . to testify . . . under oath or affirmation administered by a court reporter or a notary public if requested, with respect to any matter involved in the investigation, complaint, examination, or proceeding." FINRA Manual Rule 8210(a)(1).

No. 16-60056

conducted a de novo review and sustained the FINRA panel's findings and sanction. Wiley timely filed his petition.

## III. Discussion

Wiley raises three arguments in his petition. Wiley first argues that the SEC acted outside the scope of its jurisdiction by both regulating Wiley's insurance business and interpreting contractual rights. Moving to the merits, Wiley argues that the decision of the SEC was arbitrary, an abuse of discretion, contrary to law, and not supported by substantial evidence. Wiley's final argument alleges that his due process and equal protection rights were violated based on unfair proceedings.

We have jurisdiction over a timely appeal taken from a final order of the SEC. 15 U.S.C. § 78y(a)(1). The SEC's opinion consists of three sets of information which we review under three different standards of review. First, factual findings are upheld if supported by substantial evidence. *Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997). "'Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance.'" *Id.* (citing *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)). It is not the function of an appellate court to reweigh the evidence or substitute its judgment for that of the SEC. *Id.* Second, agency actions and conclusions of law may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Third, the SEC's interpretations of FINRA Rules are entitled to deference so long as they are not unreasonable. *See Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971).

## A. The Jurisdiction of the SEC

Wiley's first argument presents two different attacks on the scope of the SEC's jurisdiction. The majority of Wiley's briefing on this argument focuses

on the McCarran-Ferguson Act, which states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Relying on this language, Wiley argues that the Exchange Act does not specifically relate to the business of insurance, and does not grant the SEC or FINRA the ability to regulate activity solely related to the business of insurance.

When evaluating an argument that asserts the McCarran-Ferguson Act, we will find that a state law preempts a federal statute if: (1) the federal statute does not specifically relate to the business of insurance; (2) the state law was enacted for the purpose of regulating the business of insurance; and (3) the federal statute operates to invalidate, impair, or supersede the state law. *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (citing *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998)).

Crucial to a holding that the McCarran-Ferguson Act defense applies is the determination that the acts regulated by the state are part of the "business of insurance." *See Sanger Ins. Agency v. HUB Int'l., Ltd.*, 802 F.3d 732, 742 (5th Cir. 2015). We consider three factors to determine whether an act is part of the "business of insurance": "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Id.* (emphasis omitted) (citing *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982)). "[T]he focus must be on the particular activity under attack" when determining if the act qualifies as the business of insurance. *FTC v. Dixie Fin. Co, Inc.*, 695 F.2d 926, 930 (5th Cir. 1983). None of these criteria is necessarily determinative, but the absence of the first factor, transferring or spreading risk, is decisive. *Sanger Ins. Agency*, 802 F.3d at 742.

Here, the acts challenged by FINRA's complaint are Wiley's collection and subsequent deposit of client insurance premium payments in bank accounts other than Wiley's co-banking account for Wiley's personal use. These acts are not part of the "business of insurance." Wiley's challenged actions have nothing to do with transferring or spreading a policyholder's risk, were not an integral part of the policy relationship between himself and his clients, and were not limited to entities within the insurance industry. He was not accused of failing to record the customer's premium payments in the ACA or other actions directly harming the insureds. Instead, the failure at issue was failing to timely deposit the premium payments in his co-banking account, as well as conversion to personal use of the premium payments. Wiley's challenged actions do not fall into the same category as acts which the Supreme Court has found to be within the "business of insurance," such as fixing rates or selling and advertising of policies. *See Cochran*, 606 F.2d at 465 (citing *SEC v. Nat'l Sec. Inc.*, 393 U.S. 453, 459–60 (1969)). We have echoed the words of the Supreme Court in clarifying that the McCarran-Ferguson Act exemption "is for the 'business of insurance' rather than the 'business of insurers.'" *Dixie Fin. Co., Inc.*, 695 F.2d at 931 (citing *Grp. Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979)). Wiley's challenged actions as an independent insurance agent were not the "business of insurance," and he therefore cannot claim protection from his FINRA penalty by invoking the McCarran-Ferguson Act.[5]

Wiley also argues that the SEC and FINRA went beyond their jurisdiction "by interpreting private contractual rights." This argument is unpersuasive. Securities regulation involves the interpretation of securities

---

[5] Because we find that Wiley's actions did not constitute the "business of insurance," we need not address Wiley's arguments concerning the intersection of FINRA jurisdiction and Texas' insurance law.

which are, by their very nature, contracts. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) (stating that "an investment contract for purposes of the Securities Act means a *contract*" (emphasis added)). More importantly, the SEC's decision to sustain FINRA's findings hinges not only on Wiley's inability to comply with his Agent Agreement and corresponding manuals from Farmers, but also Wiley's decision to then use the customer premium payments for personal and business needs. The SEC was well within its jurisdiction when it determined that Wiley violated FINRA Rules 2010 and 8210, and Wiley's attempts to dispute the SEC's jurisdiction do not disturb the decision by the SEC.

## B. The SEC's Decision

Wiley next argues that the SEC's decision was not supported by substantial evidence, contrary to the plain language of the evidence, or made in disregard to the law. Reviewing the record, we disagree and find that substantial evidence supports the SEC's decision that Wiley violated FINRA Rules 2010 and 8210.

Wiley first argues that the Agent Agreement does not explicitly require him to follow the ACA Manual and the Agent's Guide, [6] and that the bulk of the ACA Manual and the Agent's Guide are recommendations, not requirements. While the Agent's Guide and ACA Manual contain some language that could be construed as recommendations, the language concerning the deposit of customer premium payments is clear: "all insured remittances will be processed in an agent's office through [the ACA]." Wiley was required to deposit the premiums within one business day: these deposits

---

[6] Wiley challenges the SEC's and FINRA's reliance on the testimony of Daniel Edmonds, the Farmers auditor who performed Wiley's audit; we will not substitute our judgment as to the credibility of a witness for that of FINRA and the SEC. *See Meadows*, 119 F.3d at 1224.

were "necessary" and "essential" to the ACA program, and Wiley was required to deposit the premiums on a daily basis "[n]o matter what kind of schedule [was] set up in [his] office," which would include any arraignments he may have had in his contracts with his clients. The SEC's determination that the Agent's Guide and ACA Manual required Wiley to deposit the customer premium payments within one day of closing an ACA entry was based on substantial evidence, and we decline the invitation to overturn this finding.

Wiley also argues that the SEC's decision fails to take into account Texas law on insurance, independent contractors, and conversion. But these areas of Texas law are irrelevant to the SEC's findings. The SEC found that, under the plain language of the Agent Agreement, Wiley failed to deposit customer premium payments and committed conversion as defined in the Sanction Guidelines. We have also already determined that Wiley's behavior did not amount to the business of insurance. The laws of Texas cited by Wiley have no relevance to Wiley's proceedings before FINRA or the SEC, and the SEC's decision to not consult these laws does not amount to an abuse of discretion or an arbitrary or capricious determination.[7]

Moving to the SEC's finding that Wiley's statement on the record concerning his expenditure of customer premium payments was false and misleading, Wiley argues that his statement amounts to an explanation as to why he thought his use of the payments did not qualify as an unauthorized use. Even if Wiley's statement to FINRA qualifies as an explanation, the point remains that Wiley stated that he did not use customer premium payments for personal use. This denial directly contradicts both Wiley's signed statement following his meeting with Edmonds and his email to Farmers following the

---

[7] Similarly, FINRA and the SEC's decision to not allow Wiley to call an expert to explain Texas law was not arbitrary or capricious, as calling such a witness would not have been helpful to either the FINRA panel or the SEC.

audit.  Wiley therefore made a false statement which could form the basis of a FINRA penalty, and the decision finding that Wiley violated FINRA's rules was supported by substantial evidence.

## IV. Due Process and Equal Protection

Wiley's final argument states that he was an arbitrary target for an enforcement proceeding, and that he was denied an opportunity to be heard without any explanation from the SEC.  But there is a lack of evidence supporting either of Wiley's due process arguments.

To establish that he was unfairly prosecuted, Wiley must demonstrate that he was prosecuted while others similarly situated were not, and that the action against him was motivated by an arbitrary or unjustifiable consideration, such as race or religion.  *Amato v. SEC*, 18 F.3d 1281, 1285 (5th Cir. 1994).  Wiley provides no evidence of any similarly situated agents or that the FINRA action against him was motivated by an unjustifiable consideration.  As a result, his due process argument fails.

As to Wiley's argument that he was denied an opportunity to be heard, the record demonstrates that Wiley was afforded an opportunity to argue his position before FINRA, the NAC, and the SEC.  Wiley does not specify at what point he was denied his opportunity to be heard, and we find no such denial in the record.  Wiley's argument on this point also necessarily fails.

Wiley's petition for review is therefore DENIED.