**REVISED OCTOBER 1, 2015**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40854

United States Court of Appeals
Fifth Circuit

**FILED**

September 23, 2015

Lyle W. Cayce
Clerk

SANGER INSURANCE AGENCY,

  Plaintiff - Appellant

v.

HUB INTERNATIONAL, LIMITED; HUB INTERNATIONAL MIDWEST, LIMITED,

  Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, SMITH, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The liability issues that arise in antitrust litigation often involve "complicated legal, factual, and technical (particularly economic) questions." MANUAL FOR COMPLEX LITIGATION (Fourth) § 30 (2004). But even before reaching the merits of this antitrust case involving the insurance market for veterinarians, we are faced with two difficult threshold determinations. First, was the Plaintiff, an insurance broker that desired to sell professional liability insurance to veterinarians, sufficiently prepared to enter that market to

No. 14-40854

establish antitrust standing?   Second, does the McCarran-Ferguson Act exempt from federal antitrust scrutiny the challenged conduct involving exclusive dealing between an insurance broker and insurers? We conclude that Plaintiff has established antitrust standing, but that the alleged conduct does implicate allocation of risk in the insurance market and thus the McCarran-Ferguson exemption.   The consequence is that the dismissal of the federal antitrust claims is affirmed, but the dismissal of the state antitrust and tortious interference claims is reversed.

## I.

Plaintiff Sanger Insurance Agency claims that it was forced to abandon certain prospective business plans after coming up against the anticompetitive practices of HUB International, a major player in the nationwide market for veterinary insurance.[1]   Specifically, Sanger complains of activity related to an insurance program (the "Program") issued through the American Veterinary Medical Association Professional Liability Insurance Trust for which HUB[2] serves as the Broker of Record and Administrator.

The Program offers professional liability, workers' compensation, and other insurance products nationwide to members of the American Veterinary Medical Association, the Program's sponsor.  "The Program is organized as a risk purchasing group" that is "administered through one master insurance policy issued to the [Trust]," under which individual members of the association may obtain certificates of insurance. ROA 1886–87.   HUB's role

---

[1] Given the summary judgment posture of the case, this discussion of the facts resolves all disputed issues in favor of Sanger, the nonmovant.

[2] "HUB" refers collectively to HUB International, Limited, and HUB International Midwest, Limited.

No. 14-40854

includes marketing, servicing insureds, monitoring claims, developing policy forms, and negotiating rates. Policies offered through the Program are underwritten by various insurance companies. During the time relevant to this case, Zurich American Insurance Company offered professional liability coverage to the Program under one master insurance policy; The Hartford Financial Services Groups, Inc., and Travelers Indemnity Company provided the Program's property, general liability, and workers' compensation insurance; and Continental Casualty Company underwrote an employer's practice liability policy for Program members. The insurers contract with HUB for short terms to underwrite policies.

Sanger claims that the Program accounts for a 90% share of the market for veterinary professional liability insurance and "constitutes a monopoly by which [HUB] control[s] the market for selling the insurance products in question to veterinarians throughout the United States." It argues that "HUB has taken a number of aggressive steps to both maintain and strengthen its dominance in that market." For example, HUB allegedly entered into a deal with the American Animal Hospital Association to keep it from sponsoring a competing program. HUB also purportedly developed a strategy aimed at preventing state veterinary associations from working with competitors to develop competing programs. Most relevant to this appeal, Sanger asserts that HUB entered into exclusive dealing arrangements with its insurers to prevent them from writing veterinary insurance through other brokers.

Sanger wanted to be one of those brokers. In 2007, Jeffrey Springer bought the company now known as Sanger, which had been doing business in North Texas for decades selling various types of insurance including livestock insurance. In 2011, Dr. Alan Donnell, an equine veterinarian, and Joe Bear, a

3

No. 14-40854

former employee of The Hartford in its livestock and agriculture division,[3] each purchased a 24.5% interest in the company for $196,500 with the goal of entering the veterinary professional insurance business selling insurance to veterinarians nationwide.  They planned to begin by offering insurance to equine and large-animal veterinarians, and to eventually expand to small-animal veterinarians.  Prior to their investment in Sanger, Bear and Donnell had conducted little investigation into the viability of the market, but planned to take advantage of Donnell's network and experience.  After the purchase, Bear took the most active role in the firm, working 15–20 hours per week.

Sanger began by approaching the Texas Equine Veterinary Association, which Sanger already represented for the Association's own organizational insurance needs, about having the Association endorse Sanger to sell insurance to its members.  Sanger developed its relationship with the Association as a sponsor of its 2011 and 2012 conventions, and claims that it was told by the Association's president that it wanted Sanger to be the Association's "official insurance agency."  At least one insurer, Continental, expressed interest in underwriting such a program at the 2012 convention.  One of its "sales specialists . . . recommended a co-sponsorship between [Continental] and Sanger at the upcoming TEVA convention" and stated that the company "potentially would obtain approximately $250,000 in annual premium based on Sanger's 'becom[ing] [the state association's] only insurance contract for the 300 members.'"

Sanger also claims to have had extensive discussions with the small group of insurers willing to underwrite veterinary insurance, including

---

[3] Bear also served as the general manager of Donnell's veterinary practice.

4

No. 14-40854

Continental, The Hartford, Travelers, and Zurich. Sanger was able to obtain insurance coverage from Continental for some equine and small-animal veterinarians, apparently amounting to $59,000 in new business. It was also in discussions with other insurers.

HUB learned that Sanger was soliciting business from its insurers. It reached out to the insurers to find out whether they were underwriting coverage for Sanger and expressed its concerns about their offering coverage outside of the Program. HUB also objected to its insurers' increasing Program premiums, apparently based on the threat Sanger posed as a competitor. Noting that the Texas Equine Veterinary Association "is involved with another agent in Texas looking to put an insurance program together," HUB told an employee of The Hartford that "[h]itting [clients] with a huge increase would only drive them to [Sanger] and confirm the need for another insurance program in the state." In contrast, there is no indication that HUB objected to rate increases for any insureds who were not members of the Texas association. Sanger further claims that it was told by Zurich, The Hartford, Travelers, and Continental that they had an exclusive arrangement with HUB. Claiming it had no other options, Sanger abandoned its efforts when it failed to make headway in the veterinary insurance industry.

Sanger sued HUB and its parent company for violations of sections 1 and 2 of the Sherman Act, sections 15.05(a)–(c) of the Texas Free Enterprise and Antitrust Act, sections 541.003 and 541.054 of the Texas Insurance Code which prohibit unfair competition and deceptive acts in the insurance business, and

No. 14-40854

for tortious interference with prospective business relations.[4]  Sanger claims that HUB monopolized and restrained trade in the market for "the selling and servicing" of professional liability and other insurance for veterinarians throughout the United States, both as a monopoly and in combination with the insurers (who have never been parties in this suit).  HUB moved for summary judgment.

The district court granted the motion, dismissing Sanger's case.  It held that the McCarran-Ferguson Act exempted HUB's alleged anticompetitive activity from federal antitrust law on the grounds that (1) the alleged anticompetitive conduct constitutes the business of insurance, (2) Texas regulates the business of insurance, and (3) HUB's activities do not fit within the "boycott, coercion, or intimidation" exception to the McCarran-Ferguson Act exemption.  It dismissed Sanger's Texas antitrust claims, holding that the company lacked standing because it "was not prepared to enter the market." The court then held that because Sanger's antitrust claims failed, Sanger had not shown the independent tort necessary to establish its tortious interference claim.  Finally, it held that, for the same reasons that HUB's activity did not constitute a boycott under the McCarran-Ferguson Act, it did not constitute a boycott under the Texas Insurance Code.  Sanger appeals each of these rulings.

**II.**

We begin with the claims that are at the center of Sanger's complaint: that HUB violated federal and state antitrust law when, by entering into

---

[4] Sanger also brought claims under section 3 of the Clayton Act, but later abandoned them.

exclusive arrangements with the companies willing to underwrite these policies, it prevented competitors from brokering veterinary insurance policies.

The district court dismissed the case on two grounds—standing and the McCarran-Ferguson Act exemption—that do not require consideration of the merits. Although the district court applied its holding on standing only to Sanger's state claims, it did so by relying on federal case law that applies equally to Sanger's federal claims. *See* Tex. Bus. & Com. Code § 15.04 (directing courts to interpret Texas antitrust law "in harmony with federal judicial interpretations" of federal antitrust law); *Norris v. Hearst Trust*, 500 F.3d 454, 463 n.13 (5th Cir. 2007) (applying federal antitrust standing principles to Texas antitrust law); *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 796–97 (S.D. Tex. 2014) (same). We therefore first address the standing issue, as affirming on that basis would warrant dismissal of both the federal and state antitrust claims.

### A.     Antitrust Standing

Because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) (quoting *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 263 n.14 (1972)), an antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit. *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013). "Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Jebaco, Inc. v.*

No. 14-40854

*Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997)). HUB's arguments concern the first element of antitrust standing: it claims that because Sanger had not yet actually begun brokering veterinary insurance, it could not have been injured by HUB's alleged efforts to maintain its stranglehold on the industry.[5] *See Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 313–14 (5th Cir. 1985) (noting that the rule denying standing to parties whose "entirely speculative" business plans were thwarted "denies recovery to those persons who . . . could not have suffered injury in fact").[6]

Nascent competitors excluded from the market by anticompetitive behavior pose a dilemma. On the one hand, a plaintiff who never entered a particular market but would have if not for an antitrust violation can undoubtedly challenge an antitrust violation in court. In fact, such firms may be prime targets for antitrust violations, because "early exclusion may be far cheaper than ruining or disciplining a recent entrant who has become

---

[5] A plaintiff who has not suffered an injury in fact traceable to the defendant's conduct also lacks Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Although Article III standing's traceability requirement is less strict than antitrust standing's proximate cause requirement, *see K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) ("Tracing an injury is not the same as seeking its proximate cause"), a plaintiff's preparedness to enter a market bears on both Article III and antitrust standing because it goes to whether the plaintiff suffered an injury in fact, *cf. Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 176 (3d Cir. 2001) (holding that plaintiffs who had not begun to market their product and were not prepared to do so lacked Article III standing for false advertising claims).

[6] Some other courts have subsumed the injury-in-fact and proximate cause component under the "efficient enforcer" or "proper plaintiff" element of the standing test. *See, e.g.*, *Sunbeam Television*, 711 F.3d at 1272 (analyzing preparedness as a question of the plaintiff's status as an "efficient enforcer").

established." Areeda & Hovenkamp, ANTITRUST LAW, ¶ 349a, at 258 (4th ed. 2014)). Too restrictive a view of standing would immunize incumbents from antitrust scrutiny when they only aim their efforts at new entrants (who may pose the primary threat to monopolists). On the other hand, an overly permissive standing doctrine would allow mere bystanders who lack particularized injury to benefit from another party's antitrust violation.

To balance these concerns, we have held that "one need not have an actual going business to establish a private antitrust injury," but that a plaintiff must have had "(1) an intention to enter the business, and (2) a showing of preparedness to enter the business." *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979). There is no question regarding the sincerity of Sanger's ambitions to broker professional insurance for vets; HUB only disputes the second element, Sanger's preparedness.

In analyzing this standing issue, we assume that Sanger's allegations of exclusive dealing amount to an antitrust violation. *See Doctor's Hosp.*, 123 F.3d at 306 ("Standing analysis can be most helpful in the atypical antitrust case if the court assumes an antitrust violation has occurred and then determines whether the plaintiff has suffered injury-in-fact, is a proper plaintiff and has experienced 'antitrust injury' from the violation."); Areeda & Hovenkamp, *supra*, ¶ 335f, at 91 ("[T]he court should assume the existence of a violation and then ask whether the . . . standing elements are shown."). And like other issues, standing may present disputed issues of fact which must be resolved at the summary judgment stage in favor of the nonmoving party—in this case, Sanger. *Gas Utilities Co. of Alabama, Inc. v. S. Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (per curiam) (applying this standard in an antitrust standing case contesting preparedness); *cf. Lujan*,

No. 14-40854

504 U.S. at 561 (explaining that Article III standing can be challenged at each procedural stage of a case, including the pleading stage, summary judgment, and trial).

We note at the outset of our standing analysis that this case is unlike many of the cases in which a plaintiff's preparedness is challenged. Sanger did not just attempt to broker veterinary insurance, but actually succeeded in doing so, albeit on a small scale. The company had begun selling Continental professional liability policies to approximately ten equine and large-animal veterinarians before HUB purportedly forced Continental to stop issuing the policies. Its failure to achieve its ultimate goal of competing with HUB on a larger scale does not necessarily deprive it of standing. After all, if it had fully succeeded, it would have no injury about which to complain.

But even if Sanger's successful first steps were too far removed from its ultimate ambitions for it to be deemed an actual market entrant, there is sufficient evidence to allow this lawsuit to proceed beyond the summary judgment stage. In assessing preparedness, "courts have drawn the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success." *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 994 (D.C. Cir. 1977). That description might sound good, but actually tells us little about how we determine when a business plan has crossed the line from a hope or desire into a state of maturity. Our court has framed the ultimate question as whether the plaintiff would have been able to take the steps it claimed it was precluded from taking, assuming no violation had occurred. *See Jayco*, 777 F.2d at 314 ("Because Savin's refusal to supply machines is the gravamen of Jayco's complaint, the fact that Jayco could

10

No. 14-40854

nfoundot have acquired the machines from Savin even had it satisfied all of the above elements is not dispositive. Rather, the question is whether, assuming Savin had been willing to supply Jayco with the necessary machines, Jayco would have been prepared to bid them."). Thus, the question we must answer is whether, assuming HUB had not kept Sanger out of the market through its illegal conduct, Sanger would have been prepared to broker veterinary insurance. We consider the following factors in making that assessment:

> the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment; the [consummation] of contracts by the plaintiff; affirmative action by plaintiff to enter the business; and the background and experience of plaintiff in the prospective business.

*Jayco*, 777 F.2d at 314 (quoting *Martin v. Phillips Petro. Co.*, 365 F.2d 629, 634 (5th Cir. 1966)).

Acknowledging that Sanger "had an idea and intent to execute," the district court nonetheless denied standing on the ground that "no concrete actions other than some preliminary discussions and inquiries took place."[7] ROA 837. It observed that Sanger made no agreements with the Texas Equine Veterinary Association to offer insurance coverage to the organization's members, and that while two of Sanger's owners had experience in the veterinary and insurance industries, none "had any experience in brokering a program for veterinary insurance." ROA 837–38.

---

[7] The district court's ruling on preparedness grounds likely came as a surprise to Sanger, as HUB's motion for summary judgment addressed the issue in a single short paragraph.

No. 14-40854

Our cases that have declared a nascent competitor insufficiently prepared to enter the market did so with far less evidence of preparation than Sanger presents here.  In *Jayco*, for example, we held that a firm whose owner admitted that it was not in a financial position to buy the copying machines needed to bid on a contract lacked standing, noting that the possibility of obtaining financing was not enough.  777 F.2d at 314–16.  In *Hayes*, we held that plaintiffs who were thwarted in their attempt to develop a shopping center lacked standing when they "made no significant effort" toward their goal, and did not even draw up architectural plans until after bringing suit.  597 F.2d at 974.  And in *Martin*, we held that a plaintiff with no relevant experience, no financing, and who had made no investments could not sue the defendant for hindering his plan to acquire a gas plant.  365 F.2d at 634.

On a number of fronts, Sanger was more prepared to enter the market than the plaintiffs in *Jayco*, *Hayes*, and *Martin*.  Sanger had an office and staff that it claims would only have needed to expand modestly to support its business plan, and HUB has not identified any facilities or equipment that Sanger would have needed to enter the market but was not prepared to obtain.  *Compare Jayco*, 777 F.2d at 314 ("Jayco's failure to show that it could have financed the purchase of the machines convince us that Jayco lacked the preparedness to bid.").  The company took affirmative steps, including marketing its services to members of the Texas Equine Veterinary Association, asking Continental to sponsor Sanger at the Association's 2012 convention, and conducting discussions internally and with veterinarians, insurance companies, brokers, and consultants about entering the market.  Sanger did not identify financing for expansion into the veterinary insurance market, but brokering insurance is not a capital-intensive business like constructing a

12

shopping mall or gas plant in which the financing obstacles are substantial. *See Sunbeam Television*, 711 F.3d at 1273 ("The preparedness requirement is particularly important for 'capital intensive' industries."); *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1563 (11th Cir. 1987) (holding that the plaintiff lacked preparedness to expand given the capital-intensive nature of the cable industry). And although Sanger did not have substantial experience in the niche business of veterinary insurance, its owners had relevant experience as an insurance specialist, an equine veterinarian, and a lawyer who had operated Sanger and sold insurance in a number of states. Finally, in contrast to plaintiffs in cases such as *Hayes* and *Martin* who were likely years away from their first sales, Sanger had some minor success selling Continental policies before HUB allegedly forced Continental to stop. That history of sales suggests that Sanger was able to do the work necessary to expand further.

While we can easily conclude that Sanger was more prepared to enter the market than were the plaintiffs in cases in which we found no standing, that does not fully answer whether Sanger's greater degree of preparedness is enough to clear the standing hurdle. HUB argues that Sanger lacks standing because it never presented a group of veterinarians to an insurer in order to get coverage for a group deal, an action that it claims would have been a prerequisite to successfully brokering insurance on a large scale, group basis. But this would require too much. The degree to which a business must take affirmative steps is mitigated by the impact of the antitrust violation, which we assume to have occurred when analyzing standing. Thus nascent competitors need not "pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture."

No. 14-40854

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176, 180 (E.D. Pa. 1976); *see also United Indus., Inc. v. Eimco Process Equip. Co.*, 61 F.3d 445, 449 (5th Cir. 1995) ("In the refusal to deal context, proof of futility satisfies causation when a demand is lacking."). Without access to insurers, and to the rates and coverage options offered by those insurers, it would have been futile to take these steps. Why would a vet agree to broker its insurance through Sanger if it did not know the terms of that insurance?

This is a critical distinction between this case and those in which we found no standing; the insufficient preparedness in those cases flowed from obstacles unrelated to the alleged anticompetitive conduct. The lack of financing deemed fatal in *Jayco* was not the fault of the manufacturer defendant that allegedly refused to sell copiers to the plaintiff. 777 F.2d at 314–15. The lack of financing to acquire a gas plant in *Martin* also could not be attributed to the defendant. 365 F.2d at 633–34. And the *Hayes* plaintiff's failure to obtain financing of $14 million (in early 1970s dollars) or even draw up building plans for a shopping center was not the fault of the defendants who a jury found prevented a movie theater from being included in that mall. *Hayes*, 597 F.2d at 974–75. The primary challenge in the middleman business of brokering is not capital but relationships. Sanger's contention is that HUB's exclusive dealing with major insurers in the veterinary insurance industries prevented Sanger from leveraging its relationships and offering policies. The allegation of anticompetitive conduct—which we must assume to be true for purposes of the standing inquiry—thus strikes directly at the obstacle that kept Sanger from entering the market. Absent the exclusive dealing arrangement that Sanger contends prevented it from brokering policies, a factfinder could conclude that Sanger was prepared to enter at least the Texas

14

market. *See Jayco*, 777 F.2d at 314 (explaining that standing inquiry turns on whether plaintiff would have been able to enter the market assuming elimination of the anticompetitive obstacle).

That conclusion is reinforced by evidence showing that HUB viewed Sanger as a threat. Though HUB now claims Sanger was unprepared to compete for business, HUB recognized that the Texas Equine Veterinary Association was "involved" with Sanger in trying "to put an insurance program together" and objected to its insurers increasing premiums out of a fear that this would "drive [clients] to [Sanger] and confirm the need for another insurance program in the state." Although an incumbent may well misjudge the threat a new entrant poses, the views of those actually in the market should be considered. The fact that HUB aimed its efforts at Sanger after expressing its concern about the competitive threat the company posed bolsters Sanger's argument that it was prepared to enter the market. So do the comments of a Continental sales specialist, discussed above, that reflect her view that Sanger was capable of marketing group veterinary insurance.

We therefore conclude that by pursuing a deal with a professional association of veterinarians and even achieving some success in its initial efforts, Sanger went beyond "the most basic preparatory steps" that we require of nascent competitors. *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1258 (10th Cir. 2003). Sanger has produced sufficient evidence of preparedness to survive the standing inquiry at the summary judgment stage, and we reverse the district court's ruling to the contrary.

**B.     McCarran-Ferguson Act Exemption**

In light of our conclusion that Sanger has presented a fact issue on whether it was sufficiently prepared to enter the market to establish antitrust

standing, we must address whether the challenged activities are immune from federal antitrust scrutiny under the McCarran-Ferguson Act. The Act was a response to *United States v. South-Eastern Underwriters Ass'n*, a criminal price-fixing case involving premiums and commissions for fire insurance in which the Supreme Court departed from its earlier view that insurance was not commerce subject to federal regulation. 322 U.S. 533, 552–53 (1944). Enacted the year after that ruling, McCarran-Ferguson restored the primacy of the states in regulating insurance by providing that general federal laws not directed at insurance do not "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). This has been aptly labelled a "reverse preemption" clause because it has the effect of displacing federal law when a state maintains its traditional role of regulating insurance. *See, e.g., Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's*, 587 F.3d 714, 720 (5th Cir. 2009) (en banc).

Although the McCarran-Ferguson Act's reverse preemption clause applies generally to "Act[s] of Congress" that do not "specifically relate[] to the business of insurance," it also not surprisingly includes language directed at the antitrust laws that gave rise to its enactment. 15 U.S.C. § 1012(b). It provides that the Sherman Act is "applicable to the business of insurance [only] to the extent that such business is not regulated by State law." *Id.* Antitrust law remains applicable, however, to any "act of boycott, coercion, or intimidation." *Id.* § 1013(b). Thus, the McCarran-Ferguson Act exempts from antitrust law activities that (1) constitute the "business of insurance," (2) are regulated by state law, and (3) do not amount to acts of "boycott, coercion or intimidation." *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 124

16

No. 14-40854

(1982); *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 66 (1st Cir. 2005).

Given this federalism role of the McCarran-Ferguson Act in precluding federal antitrust regulation that might undermine state regulation of insurance, it is not surprising that Texas antitrust law, despite mirroring federal law in most respects, does not incorporate a similar exemption. *See* Tex. Bus. & Com. Code § 15.05(g) ("[T]he McCarran-Ferguson Act does not serve to exempt activities under this Act." (citation omitted)). Whatever issues might arise from applying Texas antitrust law to the insurance industry that the state separately regulates, doing so does not upset the federal-state balance. Whether HUB is entitled to the exemption thus has no effect on Sanger's state antitrust claims.

With respect to the federal claims, the district court found in favor of HUB on each element of the exemption and thus granted summary judgment on the Sherman Act claims. We address each issue in turn.

### 1.    The Business of Insurance

The scope of the exemption from federal antitrust scrutiny turns largely on the phrase "the business of insurance." As with the notoriously terse language in the Sherman Act itself, *see Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2412 (2015) ("Congress, we have explained, intended that law's reference to 'restraint of trade' to have 'changing content,' and authorized courts to oversee the term's 'dynamic potential.'"), the McCarran-Ferguson Act necessarily leaves many questions to be answered through the development of case law. The law's "primary concern" is protecting "cooperative ratemaking

efforts" like the fixing of premiums at issue in *South-Eastern Underwriters*,[8] and the Supreme Court has emphasized that "[t]he exemption is for the 'business of insurance,' not the 'business of insurers.'" *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 221 (1979) (holding that an agreement between an insurer and pharmacies to set the prices of prescription drugs was not exempt).  To hold otherwise would capture "almost every business decision of an insurance company." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 352 (3d Cir. 2010) (citing *Royal Drug*, 440 U.S. at 213–17).

The Supreme Court has "identified three criteria relevant in determining whether a particular practice is part of the 'business of insurance' exempted from the antitrust laws" under the Act:

> *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

*Pireno*, 458 U.S. at 129.  The parties dispute only the first two criteria; the third plainly applies.  Furthermore, although "[n]one of these criteria is necessarily determinative in itself," *id.*, the "underwriting or spreading of risk [is] an indispensable characteristic of insurance." *Royal Drug*, 440 U.S. at 212. The absence of the first criterion—that "the practice has the effect of transferring or spreading a policyholder's risk"—is thus "decisive."  *See In re Ins. Brokerage*, 618 F.3d at 352, 356.

---

[8] This primary concern followed from a "widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 221 (1979).

No. 14-40854

Before applying these standards to this case, we address disagreement about the nature of Sanger's allegations.  HUB appears to characterize Sanger's suit mainly as a challenge to HUB's role as the exclusive broker for members of the American Veterinary Medical Association.  Sanger responds that it does not seek to broker insurance through the Association's Program or otherwise challenge that HUB arrangement, but rather only challenges HUB's use of its market power to prevent insurers from working with other brokers who seek to insure members of other veterinary associations.  We rely on Sanger's characterization of its claims, as it is supported by the allegations in the complaint and evidence in the summary judgment record, and because we must accept the plaintiff's theory of the case in conducting the McCarran-Ferguson inquiry.  *See In re Ins. Brokerage*, 618 F.3d at 356 ("[T]he precise characterization of the defendants' conduct can be dispositive."); *Am. Standard Life & Acc. Ins. Co. v. U.R.L., Inc.*, 701 F. Supp. 527, 532 (M.D. Pa. 1988) ("Determination of whether defendants' alleged conduct is exempt 'depends largely upon how one defines the "practice"' which is being challenged. . . . [W]e must look to the gravamen of the complaint.") (quoting *FTC v. Mfrs. Hanover Consumer Servs., Inc.*, 567 F. Supp. 992, 994 (E.D. Pa. 1983)).

We therefore ask: do HUB's alleged exclusive dealing arrangements with insurers constitute "the business of insurance"?

In its argument for reversal,  Sanger relies primarily on *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010).  In that decision, an insurance broker's clients alleged that the broker's "insurer-partners agreed with one another not to compete for incumbent business" (that is, for accounts up for renewal).  *Id.* at 340, 356.  The court noted that "plaintiffs do not allege that defendants' agreement involved who could receive insurance coverage, or

19

the type of coverage they could obtain." *Id.* at 357. Instead, "the complaint asserts conduct affecting not *whether* or *to what extent* a prospective insurance purchaser would transfer its risk to an insurer, but merely to *which* insurer that risk would be transferred." *Id.* The court also found it significant that "defendants' alleged agreement not to compete for incumbent business . . . appears to have been unrelated to [the] reliability" of insurers; that is, "it does not involve any restriction on the type of coverage offered or the risk profile of insurable entities." *Id.*

That mention of risk profiles identifies what is different about this case. Assuming that HUB is engaged in exclusive dealing that prevents the insurers from writing insurance for other group plans, that conduct fortifies the Program HUB operates through the American Veterinary Medical Association. Keeping a large, geographically and professionally diverse pool of veterinarians in the Program—including significant numbers of small- animal, large-animal, mixed, and equine veterinarians—spreads risk. For that reason, this case is closer to *Feinstein v. Nettleship Co. of L.A.*, 714 F.2d 928 (9th Cir. 1983), in which the plaintiffs contested "the agreement between the medical association and the insurers to offer the malpractice insurance only to members of [the L.A. County Medical Association]." *Id.* at 932. The Ninth Circuit held that this constituted the business of insurance because the practice was

> demonstrably related to the allocation and spreading of risk, for,
> as the district court pointed out, it defines a pool of insureds over
> which risk is spread. The medical association sought to provide a
> single insurance broker for all of its members in order to assure
> coverage for certain high-risk specialties, thereby distributing risk
> across the membership. The effect is to spread risk across a wide

No. 14-40854

area, and that is precisely what the Supreme Court described when it formulated the risk spreading criterion.

*Id.* at 932. Similarly, the scheme alleged by Sanger inevitably involves the transferring or spreading of risk because HUB's role as the broker is to funnel a broad risk pool to particular insurers. To the extent Sanger would have been able to siphon off HUB's vets by offering group plans through other veterinary associations, its actions would alter the composition of policyholders in the Program and thus would likely impact the Program's ability to spread risk. Indeed, although Sanger did not sue the insurance companies, the alleged exclusive dealing with HUB serves their interests at least as much, and very likely more, than it does HUB's.

Yet even if viewed more narrowly as just a "broker" case, most courts have held that routine dealings between insurers and brokers or agents[9] do constitute the business of insurance even if that relationship may not be "distinctively different from ordinary relationships with dealers marketing a product or service." Areeda & Hovenkamp, *supra*, ¶ 219b5, at 21–22. The Supreme Court has said the following on this issue:

> It is clear from the legislative history that the fixing of rates is the "business of insurance." The same conclusion does not so clearly emerge with respect to the fixing of agents' commissions. . . . One inference that can be drawn from [the legislative history] is that Congress was aware of the existence of agreements regarding agents' commissions, and chose not to include them within the exemption for the "business of insurance." On the other hand, the fact that the indictment in *South-Eastern Underwriters* had included a charge that insurance companies did boycott agents

---

[9] "Bluntly stated, an 'insurance agent' represents the insurance company, whereas an 'insurance broker' represents the insured." 7 Appleman on Insurance 2d: Law of Insurance Agents § 47.5, at 326 (1998) (footnotes omitted).

No. 14-40854

who insisted on selling other lines of insurance, together with the fact that [the boycott exception] presumably removes an exemption that, but for its absence, would be conferred by [the Act], suggests that the "business of insurance" may have been intended to include dealings within the insurance industry between insurers and agents.

*Royal Drug*, 440 U.S. at 224 n.32; *see also* Areeda & Hovenkamp, *supra*, ¶ 219b5, at 22 (observing that the "apparent motivation [for the boycott exemption] was to protect agents from insurer 'boycotts'—a protection that would be unnecessary if 'the business of insurance' did not embrace insurer-agent agreements in the first place"). *In re Insurance Brokerage* aside, a number of courts of appeals have generally followed the latter inference, and have characterized challenged dealings between insurers and agents as the business of insurance despite the fact that "an agreement not to compete to sell a particular product to a particular customer . . . would be expected . . . in any industry." *In re Ins. Brokerage*, 618 F.3d at 359. *See, e.g.*, *Arroyo-Melecio,* 398 F.3d at 68 (holding that an agreement among insurers "not to use brokers to sell policies" is the business of insurance); *Owens v. Aetna Life & Cas. Co.*, 654 F.2d 218, 226 (3d Cir. 1981) (holding that "authorizing agents to solicit individual or group policies" and "accepting or rejecting coverages tendered by brokers" are exempt activities); *Black v. Nationwide Mut. Ins. Co.*, 429 F. Supp. 458, 463 (W.D. Pa. 1977), *aff'd,* 571 F.2d 571 (3d Cir. 1978) ("The size of insurance commissions paid by companies to agents because they affect rate structures, is the 'business of insurance'."). So have we. *Thompson v. New York Life Insurance Co.* held that an insurance company's contract with an agent prohibiting him from engaging in "any other business or occupation for remuneration or profit" and offering "various incentives . . . so that [he] would

22

agree to focus all his entrepreneurial skills solely on selling insurance" was "within the business of insurance." 644 F.2d 439, 444 (5th Cir. Unit B May 1981). The insurers' alleged agreements with HUB not to insure other brokers' competing group plans are more fundamental to the risk spreading characteristics of insurance than are the noncompete agreement at issue in *Thompson*.

HUB has therefore established the first criterion in assessing whether the challenged activity constitutes the business of insurance. For similar reasons, the second criterion, "whether the practice is an integral part of the policy relationship between the insurer and the insured," is also met. HUB's conduct as described by Sanger plainly "affect[s] the insurers from which a prospective purchaser could obtain coverage," *In re Ins. Brokerage*, 618 F.3d at 356, and thus impacted "the core relationship between insurer and insured." *Thompson*, 644 F.2d at 444. And the third criterion is undisputedly met. We thus hold that HUB's conduct constitutes the "business of insurance," and is therefore potentially subject to exemption from federal antitrust law.

## 2.    Regulated Pursuant to State Law

The second element of the exemption requires that the challenged activities "are regulated pursuant to state law." This is not a high bar for antitrust defendants to clear given how courts have interpreted the statutory language that on its face seems to require a more concrete conflict between the federal and state regulation. "[I]f the state's insurance industry is 'regulated by state law,' then the antitrust laws simply do not apply, notwithstanding that the application of antitrust law in the particular case in no way 'invalidate[s], impair[s], or supersede[s]' state law and may even be consistent with it." *Arroyo-Melecio*, 398 F.3d at 66 n.7 (alterations in original)

No. 14-40854

(quoting Areeda & Hovenkamp, ANTITRUST LAW, ¶ 219c, at 339 (2d ed. 2000)); *see also Fed. Trade Com'n v. Nat'l Cas. Co.*, 357 U.S. 560, 564–65 (1958); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 219 (5th Cir. 1975) (prohibition on "all unfair methods of competition" sufficient).  The district court found this element satisfied.

Sanger does not challenge this ruling as to Texas law, but contends, for the first time, that the district court erred by granting summary judgment without finding that numerous states outside of Texas in which HUB operates also regulate insurance.  There are a number of problems with this argument.  First, because the evidence of Sanger's preparedness to enter the market that we found sufficient to confer standing primarily involved activity in Texas (such as its dealings with the Texas Equine Veterinary Association), we doubt that the allegations are sufficient to allege injury in other states' markets.  Second, although it is HUB's burden to demonstrate its entitlement to the McCarran-Ferguson Act exemption, *see Seasongood v. K & K Ins. Agency*, 548 F.2d 729, 732 (8th Cir. 1977), Sanger did not identify this issue below as one on which a dispute existed.  HUB's motion for summary judgment discussed only Texas law on this issue, but clearly sought dismissal of Sanger's claims in full.  Finally, even assuming HUB's conduct in other states is relevant to Sanger's federal antitrust claims and that this issue was preserved, we have previously recognized and can do so again via judicial notice that other states also regulate insurance.  *See Shurley v. Tex. Commerce Bank—Austin, N.A. (In re Shurley)*, 115 F.3d 333, 345 n.43 (5th Cir. 1997) ("Texas, like all states, comprehensively regulates insurers and insurance policies."); Jeffrey E. Thomas, *Insurance Law Between Business Law and Consumer Law*, 58 AM. J. COMP. L. 353, 353 (2010) ("[E]ach of the fifty states has a comprehensive and

robust system of insurance regulation through statutes, administrative regulations, and common law rules."). Indeed, Sanger does not identify any particular states that it contends do not regulate insurance. This requirement of the exemption is satisfied.

### 3. Boycott, coercion, or intimidation

Even when conduct involves the business of insurance that is regulated by state law, the McCarran-Ferguson Act does not exempt it from antitrust scrutiny when it amounts to a "boycott, coercion, or intimidation." At first glance, the allegations in this case may seem close to the "paradigm situation [involving] the collective refusal by insurance companies to deal with agents doing business with other insurers." Areeda & Hovenkamp, *supra*, ¶ 220, at 35. But the allegations in this case focus on a single broker, HUB, which turns out to make a big difference.

Sanger's primary argument on appeal is that HUB's activities alone constituted a boycott—the company's briefing repeatedly argues that "HUB engaged in a boycott" by using its alleged monopoly power to pressure insurers into not doing business with Sanger. But "conduct by individual actors falling short of concerted activity is simply not a 'boycott' within § 3(b)." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 555 (1978); *see also* Areeda & Hovenkamp, *supra*, ¶ 220a, at 36 ("[T]he term 'boycott' clearly requires an agreement of at least two firms to exclude or discriminate against another."). HUB's independent conduct seeking to leverage its supposed monopoly position as sole broker for the Program with insurers thus cannot constitute a boycott within the meaning of the exemption.

Though less emphasized on appeal than its allegations that HUB is engaging in monopolization, Sanger also intimates that the unlawful

arrangement is a horizontal agreement between HUB and the insurers.[10] If that is the case, there is a different problem for Sanger: the refusal to deal at issue in a boycott must expand "beyond the targeted transaction" to "unrelated transactions [that] are used as leverage to achieve the terms desired." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 802–03 (1993). In other words, a boycott is "the refusal to deal in a collateral transaction as a means to coerce terms respecting a primary transaction." *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1335 (11th Cir. 2004) (citing *Hartford Fire*, 509 U.S. at 801–05). For example, the Supreme Court long ago held that an agreement by lumber retailers not to purchase from lumber wholesalers that sell directly to customers is a boycott because it seeks an objective—"the wholesale dealers' forbearance from retail trade"—that is collateral to the retailers' transactions with the wholesalers.[11] *See Hartford Fire*, 509 U.S. at 803 (citing *E. States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914)). The only "collateral transaction" plausibly claimed in this case is

---

[10] Sanger also claims that HUB's agreements with the American Veterinary Medical Association constitute contracts, combinations, or conspiracies in restraint of trade, but it does not appear to claim that the Association had a role in any alleged boycott.

[11] Sanger contends that HUB and the insurers' refusal to deal is a boycott under the definition used in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). In that case, a retail chain used its "'monopolistic' buying power to bring about" a conspiracy with manufacturers and distributers of appliances to exclude Klor's, an independent retailer, from selling their brands. *Id.* at 209. The Court characterized the conspiracy as a group boycott forbidden by the Sherman Act, though the opinion does not disclose any "collateral transaction" involved. *Id.* at 209–11. To the extent *Klor's* conflicts with *Hartford Fire*, we follow the latter case, which is the only one that involves the McCarran-Ferguson Act's boycott exception. *See Hartford Fire*, 509 U.S. at 803 ("The proper definition of 'boycott' is evident from the Court's opinion in *Eastern States Retail Lumber* . . . . [T]he associations' activities were a boycott because they sought an objective—the wholesale dealers' forbearance from retail trade—that was collateral to their transactions with the wholesalers."); *but see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134–37 (1998) (citing and relying upon *Klor's* in a non-insurance case).

No. 14-40854

HUB's refusal to work with insurers who would insure Sanger's clients, but as discussed above that transaction does not involve concerted action. The actions of the insurers as a group—refusing to work with Sanger—do not involve any "collateral transactions" (they directly implicate potential transactions between the insurers and Sanger) and therefore do not constitute a boycott. Sanger has thus not alleged a boycott that avoids the McCarran-Ferguson exemption.[12]

\* \* \*

We therefore hold that HUB's alleged activities are exempt from federal antitrust law by the McCarran-Ferguson Act.

## C. Alternative Arguments for Affirming

HUB offers two alternative grounds to affirm the dismissal of the state antitrust claims that remain given our ruling on standing: first, that Sanger failed to provide legally adequate expert testimony to define the market; and second, that the exclusive dealing arrangement Sanger alleges is legal.

With regard to the former, HUB filed a motion to strike Sanger's expert, Donald House, but the district court denied it as moot when it granted HUB's motion for summary judgment. That motion asserts that House improperly "assumes the only professional liability policy available is the Zurich policy offered through the [Program]." HUB's brief on appeal, however, contains minimal argument on this point. HUB points to the motion to strike it filed in

---

[12] It is not necessary to decide whether coercion and intimidation likewise require concerted action, because Sanger disavows any argument that HUB engaged in coercion or intimidation. We note that the few courts to have addressed this issue are divided, although the leading treatise concludes that concerted activity is likely required to establish coercion or intimidation. Areeda & Hovenkamp, *supra*, ¶ 220a, at 36 (citing cases).

27

No. 14-40854

the district court as further support, but arguments made in the district court cannot be incorporated by reference on appeal. *See Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007); *Perillo v. Johnson*, 79 F.3d 441, 443 n.1 (5th Cir. 1996). Furthermore, the admissibility of expert evidence under *Daubert* is reviewed for abuse of discretion. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). It is also a determination that often benefits from a hearing and resulting factfinding, especially in complex areas like defining a market for antitrust purposes. *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 564 n.21 (11th Cir. 1998) (acknowledging that *Daubert* hearings "are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses"). Given our reversal on standing grounds, we will give the district court an opportunity to address HUB's motion to strike in the first instance on remand.

HUB further argues on appeal that no antitrust violation occurred, because the procompetitive benefits of any alleged exclusivity agreements outweigh the costs. It also vigorously challenges the factual predicate of the exclusive dealing claim, contending that no such agreements existed. Sanger declines to respond to the substance of these arguments and asserts that HUB's briefing is inadequate. Indeed, evaluating the merits of a restraint of trade under the rule of reason requires consideration of a variety of "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n.10 (2010) (quoting *Bd. of Trade of Chi. v. United States*, 246

28

No. 14-40854

U.S. 231, 238 (1918)). We decline to engage in the rule of reason's "elaborate inquiry" based on HUB's thin appellate arguments. *See Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982); *see also Liberty Glass Co., Inc. v. Allstate Ins. Co.*, 607 F.2d 135, 138 (5th Cir. 1979) (declining to address Sherman Act claims after reversing the district court's dismissal on McCarran-Ferguson Act immunity grounds). On remand, the district court may consider—after additional briefing, if it chooses to allow it, *see Zastrow v. Hous. Auto Imports Greenway Ltd.*, 789 F.3d 553 (5th Cir. 2015)—these defenses to liability.

## III.

Our resolution of these antitrust issues largely dictates our treatment of the following two state claims that are based on the same allegations: (1) tortious interference with prospective business relations and (2) unfair trade practices under the Texas Insurance Code.

To prevail on the tortious interference claim, Sanger "must establish that (1) there was a reasonable probability that [it] would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). The district court dismissed the tortious interference claim as a result of its holding that there was no antitrust standing. That, it thought, prevented Sanger from establishing the necessary "independently tortious or unlawful act." Even

were we to agree with this reasoning,[13] as discussed above we reverse the district court's holding that Sanger lacks antitrust standing. We accordingly reverse the district court's dismissal of Sanger's tortious interference claim. We note, however, that the merits of Sanger's antitrust claim—the sole "tortious or unlawful act" alleged—will ultimately determine whether it also has an actionable tortious interference claim. *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) ("[A]ppellants' claims rise and fall together, and as the antitrust claims are unsubstantiated, so must be the tortious interference claims.").

Finally, Sanger argues that the dismissal of its unfair trade practices claim under section 541.054 of the Texas Insurance Code was error. The Texas Insurance Code bars any trade practice that it defines as unfair, Tex. Ins. Code § 541.003, and defines one such practice as a concerted or agreed-upon "act of boycott, coercion, or intimidation that results in or tends to result in the unreasonable restraint of or a monopoly in the business of insurance." *Id.* § 541.054.

This provision tracks the language of the "boycott, coercion, or intimidation" exception to the McCarran-Ferguson Act exemption. *Compare* 15 U.S.C § 1013(b) ("Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate,

---

[13] Texas law actually permits plaintiffs to recover for tortious interference even when they would not have standing to assert the underlying tort. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) ("[A] plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff. The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault."). But whether Sanger suffered injury—the same inquiry involved in the preparedness determination under the antitrust laws—likely bears on "reasonable probability" and "injury" elements of a tortious interference claim.

No. 14-40854

or act of boycott, coercion, or intimidation"). We have suggested that these laws should be interpreted in harmony. *See Hood v. Tenneco Tex. Life Ins. Co.*, 739 F.2d 1012, 1017 n.10 (5th Cir. 1984) (discussing a prior codification of section 541.054). For the same reasons that HUB did not engage in a boycott under the McCarran-Ferguson Act, HUB did not violate this provision of the Texas Insurance Code. As for Sanger's assertion that "the court overlooked the statutory language proscribing anticompetitive conduct other than just a boycott," it waived any claim that HUB's conduct was "coercion or intimidation" by explicitly disavowing that argument in the context of its McCarran-Ferguson Act arguments.

**\*     \*     \***

To sum up: We AFFIRM the district court's dismissal of Sanger's federal antitrust claims and its claim of unfair trade practices under the Texas Insurance Code. However, because Sanger was not unprepared, as a matter of law, to enter the market for veterinary insurance, we REVERSE its summary judgment on Sanger's state law antitrust and tortious interference claims and REMAND for further proceedings in the district court.

No. 14-40854

JONES, Circuit Judge, dissenting.

My colleagues' view of this case is well articulated, and I am pleased to concur in most of the opinion. I respectfully disagree, however, with their resolution of Sanger's antitrust standing, an issue predicate to its assertion of Texas antitrust claims. The record, and indeed my colleagues' own analysis, demonstrates without factual dispute that Sanger was not actually prepared to enter the market for handling group insurance coverage of veterinary physicians' practices. Such lack of preparedness indicates, as our previous cases have held, that Sanger suffered no injury if it was barred from entering that market. *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 313 (5th Cir. 1985). This dissent is not about the applicable law, but about the application of law to the facts. Courts cannot allow the powerful medicine of antitrust law, powerful not only because a plaintiff can receive treble damages and attorneys' fees for proving a violation but also because the extraordinary costs of preparation and trial can force settlements in meritless cases, to benefit wannabes who file suit before they have made a credible investment in competing. The purpose of antitrust law is to benefit competition, not competitors. A lax approach to antitrust standing works at cross-purposes with the substantive law.

The applicable law of antitrust standing has long been settled in this court. Factors which indicate that a plaintiff is prepared to compete include: "the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; the consummation of contracts by the plaintiff; affirmative action by plaintiff to enter the business; and the background and experience of plaintiff in the prospective business." *Jayco*, 777 F.2d at 314 (quoting *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 634 (5th Cir. 1966)). Even if all these factors are satisfied, however, the ultimate question is whether a plaintiff would have been prepared to sell the policies to

32

a group of veterinarians through a state association even if Zurich, Hartford, CNA, and Travelers were willing to supply them. *Jayco*, 777 F.2d at 314. This analysis begins with the scope of Sanger's competitive intentions, adds dimension to the majority's description of what Sanger had to do to realize its intentions, and demonstrates why Sanger had not positioned itself actually to compete in the group coverage market.

Sanger describes its intentions confusingly, but the majority's generous synthesis is that the plaintiff does not seek to supplant HUB in the AVMA Program; instead, Sanger wants to be unimpeded in working with insurers to offer group insurance to members of other veterinary associations. Sanger also claims that it was prevented from entering this market nationwide, but there is no evidence to support that proposition. Even the majority notes that, "because the evidence of Sanger's preparedness to enter the market that we found sufficient to confer standing primarily involved activity in Texas . . . we doubt that the allegations are sufficient to allege injury in other states' markets." Based on the record, Sanger's preparedness for group coverage manifested nearly exclusively in Texas through its attempts to secure "endorsement" from the Texas Equine Veterinary Association.[1]

The majority's standing discussion hinges on its conclusion that unlike in this court's previous cases, the obstacles to Sanger becoming a competitor were related to HUB's alleged anticompetitive conduct rather than to Sanger's deficiencies. In other words, but for HUB's having allegedly locked up the market for several different types of group veterinary practice coverage, Sanger could have sold its "product" to TEVA and other groups.

---

[1] The majority's hedging on Sanger's preparedness to enter other markets affords the possibility that, on remand, standing can be summarily denied vis a vis markets outside Texas.

No. 14-40854

To know what Sanger had to do to compete, we must know what HUB did. According to the majority, HUB's role in both managing the Professional Liability Insurance Trust for AVMA and serving as the insurance broker included promotion, marketing, servicing insureds, monitoring claims, developing policy forms, and negotiating rates. Further, to assist PLIT in negotiating terms of coverage on AVMA's behalf, HUB gathered and analyzed claims data, and HUB assisted in developing rate structures for submission to various state insurance regulatory agencies. During the period in question, the AVMA PLIT offered policies for professional liability, employer's practice liability, property and general liability, and workers' comp. As the majority explains in its McCarran-Ferguson Act discussion, the "business of insurance" fundamentally relies for affordability on scale and the spreading of risk among insureds. HUB was negotiating the spreading of risk for presumably thousands of AVMA members who opted for the group insurance, thus maximizing the potential economies of scale. Concomitantly, it had to be performing the related tasks for thousands of members.

What had Sanger done to compete in the procuring and servicing of group insurance coverage? It "had an idea and an intent to execute," as the district court found. It had engaged in discussions with over twenty insurers and with veterinarians and TEVA about prospects for its venture. It became a sponsor for a few thousand dollars at two TEVA conferences. It had sold coverages to about twelve veterinary practices, generating about $59,000 in new business. Its "owners had relevant experience as an insurance specialist, an equine veterinarian, and a lawyer who had operated Sanger and sold insurance in a number of states." The majority reviews this evidence in the light most favorable to the non-movant for summary judgment, but these tidbits pale in comparison to the nature and requirements of the business it sought to enter.

34

No. 14-40854

First, none of the "relevant experience" had to do with the negotiating and servicing of group coverage of multiple types of insurance. Dr. Donnell may be a renowned equine vet, but this alone does not qualify him as an insurance broker for veterinary practices. Jim Bear had been involved in the insurance of farm and ranch businesses, but the terms of insurance coverage for those risks are markedly different from those for medical professionals. Further, Bear worked only 15-20 hours weekly as the insurance "expert" in Sanger's insurance business, while he continued to manage Dr. Donnell's medical practice. Attorney Springer and his wife purchased Sanger in 2007 and had operated it for only four years with a small staff. No evidence is offered that Sanger had ever engaged in handling group coverages, in negotiating prices based on the group risk characteristics, or servicing the volume of insureds that alone could provide sufficient risk-spreading to generate competitively attractive costs of coverage.

Second, the majority notes that insurance brokerage is not as capital intensive as other businesses in which this court has found plaintiffs unprepared to enter (and sue for antitrust violations). I agree, but there is no affirmative evidence of any significant investment beyond the $196,500 apiece paid by Dr. Donnell and Mr. Bear to buy into the Sanger agency, plus the cost of appearing at the TEVA conferences. Let us assume, optimistically, that Sanger's transformation into a HUB-like provider of group insurance and related services to an organization like TEVA (300 members) required no more than adding personnel—rather than heavy capital investment. Nevertheless, hiring and retaining a staff of qualified personnel to handle volume marketing, premium payments for hundreds of new policyholders, underwriting, renegotiating coverages periodically, and monitoring claims-handling entails fiscal as well as managerial challenges. Yet Bear spent half his working hours

away from the agency, Dr. Donnell maintained his full-time veterinary practice, and the plaintiffs acknowledge they never made a business plan.

Third, I disagree with the majority's breezy assertion that "[t]he primary challenge in the middleman business of brokering is not capital but relationships," such that Sanger was prevented by HUB's alleged exclusive contracts with insurers from "leveraging its relationships" to offer policies. The primary challenge, in my view, was Sanger's demonstrating the competence to sell and service a competitively priced specialty insurance package to groups of medical professionals. "Relationships" go only so far in assuring either the insurers or its customers, whether the entire group or individual members, that Sanger would offer quality service on all levels. The significance of this challenge is reflected in the fact that neither HUB nor the insurers HUB dealt with enjoyed long-term contractual "relationships." HUB worked for AVMA PLIT under non-exclusive two-year contracts, while the alleged "exclusive" agreements between HUB and the insurers lasted only a couple of years on average. The flexibility inherent in these arrangements suggests that price and service, far more than "relationships," govern success in HUB's business. Sanger had little more than "relationships," even discounting the availability of coverage, to reassure a group like TEVA that its ongoing level of service would be competitive.

Finally, that HUB viewed Sanger as a "threat" should be irrelevant to the question of Sanger's preparedness to enter the market for group veterinary practice insurance policies. The majority spends only one paragraph on this point, citing no case law in support, and rightly so. A competitor's outside perception of another entity's appearance in the marketplace has nothing to do with the issue at hand, which is whether this plaintiff has demonstrated its actual preparation and ability to enter the market such that but-for the defendant's conduct, it would have succeeded. Allowing a defendant's

No. 14-40854

perception to support a finding of a plaintiff's standing to sue for antitrust violations is a circular argument.

For all these record-based reasons I would have denied Sanger standing to sue under the Texas antitrust laws.  I respectfully dissent.